IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

MIDDLE DISTRICT—MAY TERM 1844.

## Wilson *against* Bigger.*

Though a former verdict in ejectment between the same parties ought not as a general rule to control the verdict in another, yet if the latter is delayed for more than 20 years after the facts occurred, the former verdict ought not to be disturbed.

One reduced to such extreme debility by intoxication as to be unable to rise or sit up in bed unless supported, and to hold a pen or make a mark unless the pen and hand are held for him, can no more execute a conveyance of his property than if intoxicated.

Where ejectment for the whole of a tract of land was brought by a guardian on behalf of his ward, who claimed it as conveyed to his father by his grandfather, and the verdict and judgment were for the defendant, and on the application of the guardian and one of the five heirs of the grandfather, the Orphans' Court decreed a sale, because it could not be divided, and the tract was sold to a purchaser, and the guardian received the minor's share of the purchase money and paid the balance, deducting expenses of maintenance, to the minor on his arrival at 21, it was *held*, that the minor was concluded from contesting the title of the purchaser.

THIS was an ejectment brought in the Common Pleas of *Franklin* county by James W. Bigger against Moses Wilson, James Wilson and David Wilson, with notice to John Finefrock,

---

* This case was argued at May term 1843.

[Wilson v. Bigger.]

terre-tenant, in which a verdict and judgment were rendered for the plaintiff below. The plaintiff claimed as only son and heir-at-law under a deed to his father James Bigger, bearing date the 15th September 1815. The defendants held under a sale as the property of Andrew Bigger by virtue of a decree of the Orphans' Court of the same county, and deed from the administrator of Andrew Bigger to these defendants, executed 21st April 1830, in consideration of $5255, including the widow's thirds, which remained in their hands, and patents subsequently obtained by them. The facts and circumstances of the case are sufficiently set forth in the points of the counsel and the charge of the court below to the jury and the opinion of this court.

*Bard* and *Thompson,* for the plaintiff in error, referred to *Werkheiser* v. *Werkheiser,* (3 *Rawle* 326) ; *Messinger* v. *Kintner,* (4 *Binn.* 97) ; *Galbraith* v. *Galbraith,* (6 *Watts* 112) ; *Mehaffy* v. *Dobbs,* (*Ib.* 363) ; *Snyder* v. *Markel,* (8 *Watts* 416) ; 6 *Mass.* 58 ; 10 *Johns.* 435 ; *Bonsall's Appeal,* (1 *Rawle* 266) ; *Billington's Appeal,* (3 *Rawle* 55) ; *Elliot* v. *Elliot,* (5 *Binn.* 7) ; *Dawson* v. *Ewing,* (16 *Serg. & Rawle* 371) ; *Bashore* v. *Whisler,* (3 *Watts* 490) ; *Lighty* v. *Shorb,* (3 *P. R.* 447) ; 1 *Pick.* 203 ; 4 *Pick.* 48 ; *Ebert and Barnitz's Appeal,* (9 *Watts* 301; *Say's Ex'rs* v. *Barnes,* (4 *Serg. & Rawle* 114) ; *Paull* v. *Mackey,* (3 *Watts* 113) ; *Colt* v. *Selden,* (5 *Watts* 525) ; 10 *Johns.* 362 ; 15 *Ib.* 142) ; *Gebhart* v. *Shindle,* (15 *Serg. & Rawle* 238) ; *Bank of North America* v. *Wikoff,* (2 *Yeates* 39) ; *M'Pherson* v. *Cunliff,* (11 *Serg. & Rawle* 422) ; *Thompson* v. *M'Gaw,* (2 *Watts* 161) ; *Gallaher* v. *Collins,* (7 *Watts* 554) ; *Gelbach's Appeal,* (8 *Serg. & Rawle* 205) ; 2 *W. Blac.* 977 ; *Adlum* v. *Yard,* (1 *Rawle* 163) ; *Stroble* v. *Smith,* (8 *Watts* 280) ; 1 *Atk.* 489, 631 ; 2 *Kent* 229 ; 1 *Pick.* 229 ; *Law* v. *Patterson,* (1 *Watts & Serg.* 193) ; *Brown* v. *Caldwell,* (10 *Serg. & Rawle* 117).

*Stevens,* contra, cited *Hemmich* v. *High,* (2 *Watts* 159) ; *Chitt. Con.* 152, 3 ; 10 *Pet.* 75 ; 10 *Mass.* 137 ; 14 *Mass.* 144 ; 9 *Conn.* 330 ; 9 *Mass.* 63, 5.

The opinion of the Court was delivered by

Huston, J.—James W. Bigger was plaintiff below. I will endeavour to state all the prominent facts which appeared in the case. Andrew Bigger owned the land in question, and on the 19th September 1815 conveyed it to his son James Bigger, in consideration of natural love and affection and of £500, paid as stated in the deed. It was recorded the next day, 20th September 1815. It was fully proved that no money was paid or bonds given at the date and execution of the deed. But on the 10th December 1816 an article of agreement was drawn and executed, and at the same time eight bonds were drawn and executed for £62.10 each, one payable in 1819, and one in each succeeding year to 1826 inclu-

sive. These bonds were all dated 19th September 1815, the date of the deed. The article is not before us, but I understand from the other parts of the case that it transferred to James all the stock and farming utensils, and in general all the personal property, and contained a provision for a part of the house and maintenance for Andrew Bigger and his wife during their lives. One witness, who had been spoken to by James to draw a will, then to draw an article of agreement between him and his father, but had done neither, and who was present the whole evening the deed was executed and acknowledged, and who declined signing it as a witness because, if any dispute about it, he being a schoolmaster and a single man, might be out of the neighbourhood, swore that he saw no money paid, nor talk of any or of bonds at the time the deed was executed. James had procured the deed to be drawn by a respectable lawyer in Chambersburg. James had sent or gone for and procured the attendance of three respectable neighbours to be present, one of whom was a justice of the peace, and took the acknowledgment of Andrew Bigger and wife to the deed. Two of them were dead before the trial. The third and the schoolmaster, Casey, were examined, and both proved that James read the deed or part of it, and neither was positive as to reading all of it, before it was executed. Hays, one of the witnesses to the deed, swore he had conversation that evening with Andrew Bigger *or his wife, and he did not know which,* about their trusting James to pay the money and fulfilling the agreement afterwards put in the articles in 1816; that it was the witness who suggested the drawing the articles of agreement and bonds in 1816. He also proved, as did other witnesses, that old Mr Bigger had often spoken of dividing his land between his two sons, James and John. (He made a deed to John in September 1818; about that part no dispute that we know of.) The same witness proved that James and the old people lived together amicably until James got married and died before his father; and the witness, Hays, who was administrator on his estate, proved that he left no personal estate, was a good deal in debt, and that all the stock on the farm was sold by the sheriff for debts of James and the old man before James's death, which was in September 1820. After his death, his widow moved to her father's, leaving the old people in possession; and soon after H. Wesby, a son-in-law, moved in to take care of the old people and the farm. It appears the old people did not live long; for to April term 1821 an ejectment for the property was brought by the present plaintiff, by his guardian. The plaintiff is the only child of James. A trial in August 1823, and verdict for defendant.

On the 1st March 1820, Andrew Bigger executed assignments on the eight bonds, one to each daughter, in the presence of and witnessed by Hays and John Parkhill, who did not remember whether the bonds were produced by James or old Mrs Bigger.

[Wilson v. Bigger.]

It seemed to be conceded that in 1819 and after, old Andrew Bigger was incapable of understanding any business. There were many witnesses examined as to the capacity and state of mind of Andrew Bigger in 1814 and 1815, and, as is often the case, much difference of opinion. All agreed that through his whole life he occasionally drank too much; and in 1814–15, while a turnpike-road was making, this habit increased on him. It was proved that formerly he made close and hard bargains as to personal property. No proof as to his dealings about 1815. That formerly, when drunk over-night, he would be well in the morning; that latterly after drinking, (and a tavern-keeper near him, who swore his mind was quite good, stated that he would be at his house drinking two weeks at a time), he would be sick and stupid for some days. That when the deed was executed, he had been sick from intoxication a day or two, and was so feeble that he was lifted up in bed, and a person had to hold his hand while he made his mark to the deed; but after getting some liquor he got up and was noisy and funny, though before he got whiskey he would not speak much.

After the trial and verdict and judgment in 1823, no proceedings of record until 21st August 1826 a petition was presented by James Dixon, guardian of the present plaintiff, to the Orphans' Court, to sell an undivided fifth part of the land in question, endorsed "petition granted," and nothing further done. On the 13th January 1829, on petition of Spencer Maden and wife, one of the daughters of Andrew Bigger, the court awarded an inquest to divide or value and appraise this land and another small tract. 16th April, inquisition returned and confirmed. This tract valued at $5116.50, and another tract at $568. Rule on the heirs to accept or refuse. Rule served, and a request that the land be sold. 10th August 1829, James Dixon, guardian of the plaintiff, appeared and joined in the request for a sale. 20th January 1830, administrator returns sale in pursuance of the order and continuance. Large tract 161 acres, small tract 66 acres, total 227, for $23.04 per acre, to defendants. Sale confirmed. 21st April 1830 deed, Philip Stair, administrator, to Moses, James and David Wilson, consideration $5255. On the 3d and 4th March 1835, two patents to the Wilsons for the land.

The administrator proved that the Wilsons paid the whole purchase money, and that he paid the share of the plaintiff below to his guardian. This was one fifth part of the whole price. It was also proved it was the same land. It was also proved that no funds in hands of the administrator but the price of the lands, and receipts produced for payment to guardians, and the last sum $366.49 paid on a settlement and calculation made by Frederick Smith, Esq. in presence of guardian, administrator and plaintiff below, then of age, and his receipt produced. His guardian, who was his grandfather, swore that he said at the time he received

the money, he would push for the whole place. The administrator said he did not hear this.

The plaintiff requested the court to instruct the jury,

1. That if the deed of Andrew Bigger to James Bigger of 19th September 1815 is valid, Andrew Bigger thereby divested himself of his title to the land; and the subsequent sale by Philip Stair, the administrator of his estate, passed no interest or title to the defendants, who were the purchasers.

2. That the sale to the defendants under the order of the Orphans' Court, the receipt of the money arising from such sale during his minority by his guardians, the subsequent settlement of the plaintiff shortly after he arrived at the age of 21 years with his guardian Philip Winters, and his receipt at that time of the balance of money in said guardian's hands, is not in law a confirmation of the title of the defendants to the land purchased by them as the estate of Andrew Bigger deceased, and does not operate as an estoppel to the plaintiff's right of recovery in this action.

3. That the presumption of law is in favour of the sanity of Andrew Bigger at the time of the execution of the deed; and that if the jury believe he was capable of executing it on the 19th September 1815, and that its execution was not fraudulently procured by James Bigger, the grantee, then the legal title to the land is in the plaintiff, and he ought to recover.

4. That if the jury believe that Andrew Bigger was incapable, on the 19th September 1815, of executing the deed to James Bigger, but subsequently was capable of ratifying and confirming the same, and did so ratify and confirm it by his declarations, acts, and acquiescence in the possession of the land by James Bigger, the grantee, then and in that case it is a good and valid deed, and conveyed the legal title to the grantee, and under it the plaintiff ought to recover in this action.

5. That the former verdict and judgment in an action of ejectment is not evidence entitled to any weight by the jury, who are bound to decide from the testimony on their own consciences, and not on the consciences of other men.

The defendant requested the court to instruct the jury,

1. That if the jury believe that the deed in evidence from Andrew Bigger to his son James Bigger was obtained by the undue influence of the son over an imbecile old man, such deed is not valid, but void.

2. That if the jury believe that at the time of executing said deed Andrew Bigger was not of capacity to make such a contract as disposing of his large real estate, such deed is not valid.

3. That the procurement of said deed by James Bigger without any evidence of request by his father—the execution of the same without the payment of any money, the execution of any bonds, or any provision for the support of Andrew Bigger and wife—are

[Wilson v. Bigger.]

strong circumstances from which the jury may infer that the transaction was not understood by the old man, and that advantage was taken of him by his son James.

4. That though the verdict and judgment had on the title of the plaintiff, claiming under the deed of Andrew Bigger to James Bigger in 1815, is not a bar to the present action of the plaintiff, it is, however, entitled to much weight in the consideration of the jury in favour of the defendants.

5. That if the plaintiff intended to avoid the acts of his guardian in the Orphans' Court and the decrees of that court, he was bound to do it immediately on his coming of age; and the omission to bring suit against the defendants, *bonâ fide* purchasers, or enter on the land, immediately after his arrival at the age of 21, was a confirmation of the acts of said guardian and court, which he is not at liberty to avoid.

6. That the receipt of the money from Philip Winter, the guardian of the plaintiff, if he knew the same was part of the proceeds of the sale of the lands of Andrew Bigger to the defendants, was a confirmation of said sale, and a bar in equity to a recovery of said land now from the defendants by the said plaintiff.

7. That the plaintiff could not recover one-fifth of the proceeds of the estate sold as the estate of Andrew Bigger, and claim the whole as the estate of his father from a purchaser; such claim would be repugnant, and plaintiff by his acquiescence and receipt of the money from his guardian, confirmed the election made by his guardian to claim his share of the estate as heir to his grandfather.

The court charged the jury as follows:

" This is an ejectment for a tract of land in St. Thomas township, of considerable value. The dispute about it is one of long standing, having been tried in this court in another suit upwards of 20 years ago. It is the imperative duty of the court and the jury to see that the case is now determined according to the legal rights of the parties, and without the slightest reference to anything but their legal rights.

It is admitted by the counsel on both sides that Andrew Bigger was the owner in fee-simple of the land in question on the 19th day of September 1815. The plaintiff has produced and read in evidence a deed from Andrew Bigger to James Bigger, dated 19th September 1815, conveying the land in dispute to James. About five years after the date of the deed, James Bigger, the grantee in the deed mentioned, died, leaving the present plaintiff his only child and heir. These facts make out a complete title in the plaintiff, and on them he would have a right to your verdict, if no evidence had been given by the defendants. Whether he has that right notwithstanding the evidence on the other side, will

[Wilson v. Bigger.]

depend upon your opinion of its weight when you come to consider it in connection with the rebutting evidence of the plaintiff.

The first evidence of the defendants which we will consider is that which relates to the former verdict and judgment. It appears from the testimony of James Wesby, who married one of the daughters of Andrew Bigger, that after James Bigger's death he went into possession of the land and moved into the house, as he says, to take care of the old people; that he lived there under Andrew Bigger until his death, which took place two years after James's death; and that after Andrew Bigger's death he kept possession for the heirs of Andrew Bigger, of whom his wife was one. Against this witness and Andrew Bigger an ejectment was commenced in this court to April term 1821. On the 29th November 1822 a jury were called and sworn, who after hearing the evidence could not agree, and were therefore discharged. On the 28th August 1823, and after the death of Andrew Bigger, the case was submitted to another jury, and that jury returned a verdict in favour of the defendant and against the present plaintiff, who was prosecuting that suit by his guardian, Peter S. Decker. This verdict and judgment has been read to you, and a good deal has been said about it in the argument. The counsel on both sides have requested us to charge you upon the effect and weight to which it is entitled.

5th point of plaintiff and 4th of defendants. Neither of these points states the law exactly as it is. It is admissible evidence, and it would be a vain thing to admit it, if it were entitled to no weight under any circumstances. If the other evidence in the cause is doubtful, if the facts on both sides seem nearly balanced, it may weigh enough to settle the question in favour of the party for whom the former verdict passed. But if the evidence on either side is clear, or if it does not hang nearly in a balance, you must decide the cause, according to the evidence before you, in favour of the party who has shown himself to be the true owner of the land in dispute. The former jury were sworn, it is true; but they were not sworn for you, and there may be evidence here which they had not before them. If you believe the weight of evidence is decidedly with the plaintiff, he is entitled to your verdict, notwithstanding the former verdict against him.

It is alleged that Andrew Bigger was incompetent to make a deed from defect of understanding, and that the conduct of James Bigger in obtaining the deed from his father was fraudulent. If this be true, the title to the land was not passed by the deed of the 19th September 1815, but remained in Andrew Bigger, and the defendants are entitled to your verdict. This being an important matter of fact, of which you are the exclusive and only judges, I will call your attention to the evidence on both sides which has been given in support of, and in opposition to this allegation. The defendants have called and examined the following

[Wilson v. Bigger.]

witnesses, who testify more or less directly that in their opinion he was not competent to make a bargain by which his whole estate was disposed of: Henry Wesby, a son-in-law; Mrs Clayton, Mrs Maden, Mrs Wesby, his daughters; Ruth Jeffries, a granddaughter, who lived with him some years; Thomas M'Dowell, one of his neighbours; and William Parkhill, another neighbour and acquaintance. George Mish was acquainted with him, and thinks he was hardly fit to make a bargain. Joseph Casey was present at the time the deed was executed, and though he does not say that he considered him incapable of executing a deed, he speaks of his depressed spirits, lethargic indifference, weak mind, &c. Judge Bard, George King and George Vance also give their opinion that he was a weak-minded man. The mere opinion of a witness, unless he is particularly skilled in the matter about which he testifies, and taken apart from the facts on which the opinion is founded, is not of very much value. The testimony of the daughters and sons-in-law of Andrew Bigger is also to be considered in connection with the fact that when this cause was tried before they were parties to it. A position more unfriendly to the formation of an impartial and accurate judgment *cannot* well be conceived than that of a person who has important interests depending in a court of justice upon the facts on which his opinion is afterwards asked as a witness. You will make whatever allowance for this circumstance you think ought to be made in weighing the testimony given by these witnesses, remembering that they are corroborated by other witnesses of respectable character, and who are not liable to this objection.

But does the whole of this evidence, viewed in its best aspect, prove that the grantor in the deed, Andrew Bigger, was incompetent to make a deed at the time the one in question was executed? The law allows every person who is not insane to dispose of his property as he pleases. The liberty of every man, from the highest intellect in the country down to him who stands on the very verge of idiocy, is in this respect unfettered. When the mind sinks below the line which divides reasonable men from those who are under the dominion of insanity, the law steps in, takes the party under its special protection, and forbids any person to make contracts with him. Not one of the witnesses here has said that Andrew Bigger was insane, nor has either of them said anything from which it can be inferred that he was deranged, or was thought to be deranged by any one who knew him. This being the fact, he was competent in the eye of the law to make a deed; and it is therefore of no consequence, so far as this matter is concerned, whether he was competent according to the witnesses' ideas of competency or not. But although this evidence is wholly insufficient to set aside the deed on the mere ground of incompetency in the grantor to make it, yet it may be of much importance to the defendants in making out their other allegation,

[Wilson v. Bigger.]

to wit, that the deed was fraudulent.　If James Bigger obtained this deed by practising a fraud, or by the exertion of any extraordinary influence over his father, you will disrègard the deed in making up your verdict, and of course decide for the defendants.

Three important questions present themselves to your consideration as preliminary to that of the fraud alleged against James Bigger.　1. Was Andrew Bigger a man of very weak understanding?　2. Had his son James Bigger extraordinary influence over him?　3. Was the contract of which the deed in question is the evidence and the consummation, a manifestly foolish and unreasonable one?　If either of these questions can be answered in the affirmative—much more if they must all be so answered—very slight proof of fraud would be sufficient to justify you in looking upon the deed as invalid.　To establish these facts or either of them, would be to make the deed a very suspicious one, and would require you to look into all the circumstances attending its preparation and execution very narrowly.

1. On the first question, then, you have the testimony of the witnesses produced on part of the defendants, and to which I have already referred.　Three witnesses of the defendants however say, one of them that he was capable of taking care of his own interests, another that he knew well what he was about, and another that when sober he was a sharp man.　Several of the defendants' witnesses stated upon cross-examination that they never knew him to make any bad bargain but this one with James. The plaintiff has called the following witnesses, &c.　If these witnesses are believed, and more especially if the full, clear and detailed statement of Robert Hays, a subscribing witness to the deed, be true, you will readily see that Andrew Bigger, though given to a habit of frequent intoxication, and somewhat singular in many respects, was a man of good understanding and very far from being a fool.　From their account of him, he would be as likely as most men to understand his interests and his rights when he was making a deed for his property.　Nearly all of them speak of the tenacity with which he held fast to his property, and of the caution with which he avoided making a bad bargain, even when drunk.

2. Had James Bigger any extraordinary influence over his father?　To several witnesses the old man said that James harassed him for a conveyance of the property; to some he spoke of being tormented by James; to others he said James wanted him to make a deed for the land, but he would not do it as long as he lived, unless he was drunk or out of his senses.　What does this prove? Simply this; that James tried to get his father to make him the deed and failed.　Instead of being any evidence that he had great influence or control over him, it proves the very reverse.　So when Ruth Jeffries overheard the conversation between them from the clothes-press, the old man's answer to James's solicitation

[Wilson v. Bigger.]

sign an agreement shows that he could resist stoutly enough. The old man said frequently that he intended giving James the property on the terms on which he did give it to him. James worked on the place for eight years after he came of age, perhaps on the faith that the property would be given to him on easy terms. It was perfectly natural that he should be anxious to have it secured beyond the danger of revocation, and it was perhaps quite as natural that the father should feel reluctant to part with all his property, and that he should desire to keep the staff in his own hand as long as he could hold it. There is, however, nothing that we can see in the evidence which proves that Andrew Bigger was afraid of his son James, or that he regarded him with uncommon affection, or which makes it probable that he would feel constrained to comply with James's wishes, if his own judgment was the other way.

3. Was this an unreasonable, foolish or unconscionable contract? If he had been thirty years of age, and had conveyed his property to a stranger, it might have been so considered. But he was old; he could not expect to live many years, and could not take his property with him to the grave. Is there anything wonderful in an old man under such circumstances making a provision for the disposal of his property? If this had been a will, no one would have thought it foolish or imprudent. It was a testamentary arrangement, and was meant to serve in place of a will. The question is not whether he acted in the way you would have done under similar circumstances, but whether he acted according to his own will and judgment. He was the judge. Under this head I have chosen to arrange the very important evidence which the plaintiff has produced to show that Andrew Bigger had formed the intention of making this very arrangement many years before. John was to have one part of his real property and to pay £400, and James to have another and pay £500. So long ago as 1806, this intention was partly carried into effect by an agreement in writing with John for his part, and the agreement was performed by the execution of a deed to John in 1818. Dixon, one of the defendants' witnesses, says that Andrew Bigger told him some years before the deed was made to James, that he was much concerned about the way he should divide his property, and had lost many nights' sleep about it. A man who was thus anxious on such a subject would be likely to come to a conclusion. Accordingly we find him expressing his intentions to the following witnesses, &c.

If this should be your view of the evidence, you will readily see that the deed in question was made by a man of sound mind, in his sober senses, and under no circumstances particularly unfavourable to a fair transaction. It was a deed executed in the presence of his wife, a woman of ordinary sense; in the presence of his nearest neighbours and friends, after it had been fairly

explained and read to them and to him; when if he had been unfit to govern his own conduct, the very persons were there who could and would have given him whatever advice he needed. Besides all this, it was merely carrying into effect a perfectly reasonable and natural arrangement for the disposition of his property, which he had deliberately formed, long entertained, and frequently expressed to his family and his neighbours. To set aside a deed of this kind on the ground of fraud in the grantee, requires clear evidence. Such circumstances afford no ground for a presumption of either fraud, imposition, constraint or mistake. Fraud or mistake should be proved. We repeat, however, that if you should be of opinion that Andrew Bigger was a very weak man; that James had great influence over him, or that the contract was unreasonable and foolish, then the evidence of fraud required to invalidate it would be much lighter. Even in that case, however, there must be some fraud shown, or some improper advantage proved to have been taken. For if the old man was weak-minded, but his weakness was not imposed on; if James had great influence upon him, but did not exert it; or if it was an unreasonable bargain, but he made it with his eyes open; the deed is still valid. On the other hand, if none of these circumstances exist at all, and you should treat this deed as invalid and insufficient to pass the title of the property without satisfactory evidence of actual fraud or deceit, it would be a violation of law and justice. These remarks answer the defendants' first two points, and the plaintiff's third point.

3d point of defendants. This is rather a question for the jury than the court, but we will give our opinion since it is asked. The procurement of the deed by James—that is, his getting it written by Crawford without any direction from his father, so far as is proved—would, if totally unexplained and taken unconnected with the other facts of the case, be cause of some suspicion; but when you recollect that the deed was read and explained to him, that his wife was present, his daughter invited into the room, four of his neighbours there—among them a justice of the peace—and that he declared he understood the whole matter and expressed regret that he had not done it long before, it does not seem a matter of much consequence who drew the deed, when it was drawn, nor at whose request. As regards the fact that no bonds were executed when the deed was made, nor any provision then made in writing for the maintenance of Andrew Bigger and his wife, you will remember that if Robert Hays has testified truly, there was a verbal agreement for their maintenance made at the time, which was afterwards put into writing and signed, and that the old people said they were willing to trust James for the future execution of the bonds—a confidence not misplaced, for he afterwards did execute them in good faith according to the agreement, and the old man took them and assigned them to his daughters,

agreeably to his often expressed intention. In all this there was no fraud, nor ground for suspicion of fraud. I have already said that fraud must be proved. I cannot call to mind any evidence of a false representation made by James Bigger to his father about this property or the deed. As regarded the property, how could any misrepresentation of James deceive the old man? The latter knew as well as the former what was the condition of his property and the state of his family. To make out a case of fraud, it was necessary to prove that James either misrepresented or wilfully concealed some material fact of which the old man had not the means or power to judge for himself, or that James controlled him by force or fear, or in some other way caused him to act against his judgment and inclination. I throw out of view the subsequent complaints of Andrew Bigger, and the ill-treatment of him by James. Andrew Bigger had no right to revoke the deed after it was made, and James's misconduct then could not affect the validity of a deed already executed. But if in the course of their disputes you can find anything which amounts to an admission by James that he had cheated his father, you will give it the weight to which such an admission is entitled when taken in connection with the other evidence. But even if he admitted that his father was cheated, or that he was not competent to make a bargain, and if such admission was contrary to what all the evidence shows to have been the truth, it ought not to carry your verdict in favour of the defendants.

We now come to another point of the case. It appears that after the ejectment already spoken of was determined in this court, an application was made to the Orphans' Court for a writ of partition by Spencer Maden and wife. The writ was awarded, an inquisition was held, and the property appraised as the estate of Andrew Bigger deceased. None of the heirs of Andrew Bigger being willing to take it at the appraised price, a decree was made by the Orphans' Court that it should be sold. It was sold, and the proceeds divided among Andrew Bigger's heirs. Of all these proceedings the plaintiff's guardian had notice, and his guardian received the share to which, as one of the heirs of his grandfather, he was entitled, from the administrator who sold the land. Soon after he became of age his guardian paid him the money, or so much as was left after deducting the expenses of his education and maintenance. Do these circumstances prevent the plaintiff from recovering in the present action? If you believe Mr Will, he expressed his intention to "push for the old farm" when he received the money from Winters; and this would show that he did not intend his acceptance of that money as a waiver of his right to the land. But if, notwithstanding his own intentions, the act itself is a legal bar to his recovery, he must submit to the law, whatever may be the supposed hardship of his case.

5th point of defendants and 1st point of plaintiff. This depends

to some extent on his knowledge of his rights and the facts of the case. If he, with a full knowledge of his guardian's conduct during his own minority, acquiesced for any considerable length of time after he became of age, he did confirm the acts of his guardian and the decrees of the Orphans' Court. But this does not apply to the case very forcibly. The regularity of the proceedings in the Orphans' Court is not impugned in this suit. Those proceedings did not devest his title to the land, if he had one. They conveyed and were intended to convey to the purchaser under them, whatever interest Andrew Bigger had in the land at and immediately before the time of his death, and if he had no title, the purchaser got none. The plaintiff's guardian could not traverse the allegation of title made by Andrew Bigger's heirs in that proceeding, and the Orphans' Court had no jurisdiction to try the question of title between them, if such a question had been raised.

6th point of defendants. There is no direct evidence that the plaintiff knew whence the money came which he received from his guardian. At the time of the settlement, if you believe Mr Will, there was nothing said about it. Smith remembers nothing of the kind. In the guardian's statement made by Smith, there is nothing of the sort put down. Though there was a short conversation about the farm, it was not stated that the money he was receiving came from the sale of it. The guardian himself does not mention any fact from which it can be inferred that he told him. But as this case will probably undergo a revision in another court, and the defendants ought therefore to have an opportunity of settling definitively every question that can arise in the case now or hereafter, we rule this point against them upon the hypothesis which they have put, and charge you that if he did know whence the money came, he did not forfeit his right to recover the land by taking the money.

The 7th point of the defendants is already answered in our remarks on their 6th point. It is only necessary to say that we deny the law to be as stated in the point, and of course refuse to charge you as requested.

The 2d point of the plaintiff is answered already in our reply to the 6th and 7th points of the defendants.

The defendants do not appear to have been misled by the conduct of the plaintiff. They had notice of this claim and of the title on which it was founded. One of them was a juror when it was tried before. They spoke of the plaintiff's claim before they bought. According to their admission, they discovered the title to be bad at the time of the sale, and wanted to get it insured. From this proof of full notice, together with their declaration that they had received profits to as great an amount as the purchase money, and the much higher price which they once said they would give for the plaintiff's title, it is fair to presume that they

indemnified themselves for the risk which they knew they were running, by the low price at which they got the land.

4th point of plaintiff. Whether the deed could be confirmed after it was made, supposing it fraudulent when made, depends on the kind of fraud proved against it. If there were any circumstances of actual fraud, of positive deceit or falsehood, or of direct imposition proved against the grantee, then it could not afterwards be confirmed by the grantor. But if the fraud were only inferred from the condition or relation of the parties, or the contract an unconscionable one because of that relation, then it might be afterwards confirmed.

The points of law raised in the cause being thus disposed of, you will perceive that your verdict depends on your opinion of the fairness and honesty of the deed of the 19th September 1815 from Andrew Bigger to James Bigger."

The defendants excepted to the charge.

I will not say there is clear error as to the effect of former verdict; but in a case where at first all turned on the capacity of Andrew Bigger and the management of his son James, I would have gone further than the Judge, and said a verdict obtained on the testimony of witnesses who stated their knowledge from recent facts and observations, ought never to be disturbed by testimony fished up from the oblivion of more than twenty years. As to the proceedings of the plaintiff and his several guardians, I shall come to that again.

There are few men who from circumstances have had opportunities of judging of the state of mind in which a person is, when after several days' intoxication he falls into such a state of debility that he can neither rise nor sit up in bed unless supported, and when he cannot hold a pen or make a mark unless the pen and hand are held for him. I have known two men throw themselves in the river, one of whom perished in that state, though, as they were able to go to the water, they were not so debilitated as Andrew Bigger when this deed was signed for him. And I would have told the jury that men who had never seen Andrew Bigger or any other person in that deplorable situation, could form no correct opinion of the state of mind in such situation; and that his capacity at other times when sober formed no rule by which to judge of his acts at such a time. The effect of a grog in rousing one who could neither rise or sit up unless held, nor make a mark with a pen, but it must be made by another who holds the hand and the pen, proves his situation and the cause of it; and I would give no more effect to an instrument signed in such circumstances, than to one signed when so drunk that he could neither stand nor walk, and scarcely so much.

There is no discrepance between Casey, who was attending closely to all Andrew did and said, and Hays, who heard Andrew *or his wife* say they could trust James to give the bonds, &c.; and

from the testimony of this Mr Hays, there would never have been an article drawn or bond given unless at his instance or that of some other person. It does not appear who held these bonds. They were produced and proved by the witnesses of the plaintiff below; and although the bonds were endorsed by assignment to the daughters, it does not appear that they or any one of them ever saw or heard of them. There is something strange in the plaintiff below asking to recover the whole land, without paying or proposing to pay these sums to the persons to whom they were assigned, or repaying to the Wilsons, whose money paid what was due to the holder of these bonds. I know of no authority or principle which would justify such a recovery.

The old man had two sons and four daughters. As another tract had been conveyed to John, and that considered as an advancement, there were four daughters and James or his son among whom to divide. The fact that the guardian of the plaintiff considered the verdict and judgment in the ejectment as having settled the right, and his application to the Orphans' Court for an order to sell, would not of itself be conclusive against the plaintiff, especially as there was nothing done on that order; but the petition of his guardian that the whole tract should be sold, the receipt by the guardian of part applied to the maintenance and education of the plaintiff, and his application for and receipt of the balance of his share of the price of the land, is conclusive on his right.

This principle runs through our whole law. A man cannot take a bequest under a will, and then object to and set aside the will. That a child should not take his portion of an estate sold by order of Orphans' Court, and then prove the sale unauthorized and take the whole from the person who had purchased and paid for and improved it, was considered and settled in *M'Pherson* v. *Cunliff*, (11 *Serg. & Rawle* 426–7–8), and other parts of the case, for the point above stated. Much of that opinion applied to a question much discussed a short time before that trial, viz., whether a sale by order of Orphans' Court could be set aside by ejectment in another court, or could only be affected by appeal from the decree of the Orphans' Court. All principle would support the latter opinion; but the trial by ejectment had been successfully applied in one or two cases. Our late Act of Assembly and one or two decisions of this court would seem to have settled this point also. But the position taken by the Judge in the pages above cited has never been disputed, and has controlled the cause in some pretty strong cases. In 1 *Rawle* 163 we find *Adlum* v. *Yard*. James Yard had conveyed his property in trust to pay certain creditors on terms and conditions which, in the opinion of all the court, rendered it void. Some personal property had been disposed of by the assignees, and Mr Adlum, a large creditor, accepted a dividend of this and gave his receipt. At that time he had no suspicion of anything unfair. On finding out what

[Wilson v. Bigger.]

induced him to believe the most egregious fraud in more than one respect, he proceeded as if no such deed had been made. That deed, under the statute of Elizabeth always considered as the substratum of our law on the subject, was "frustrate, void and of no effect." I considered the case as not within the principle above stated, because of the positive words of the statute, and because there was evidence that Adlum accepted his dividend (a very small one) before he knew of any actual fraud; but he had seen the deed, some of the provisions of which were void, and the other Judges agreed (page 171) that having accepted a dividend under that deed, he could never treat it as void.

This principle has been repeatedly recognised in this court. *Stroble* v. *Smith* (8 *Watts* 280) is a clear case, and we have many others. In fact, it has been considered as not open to debate. But it was put in the court below on two other points, 1. that he received this money soon after he came of age. It is clear he knew that this was his share of the price of the land. Now there are cases in which a settlement made between a guardian and his ward of their own accounts of expenditures and payments will be opened, where there was imposition or *concealment by the guardian,* and ignorance of the facts or of his rights by the ward. This is not such a case. It does not suggest any unfairness in the guardian, who is no party to this suit or affected by it. The other matter mentioned is that the grandfather of the plaintiff says he stated when he got his money, "now I will try for the whole place." Neither the counsel who made the calculations and stated the account or the guardian heard this; but it does the plaintiff below no good; it shows that he knew what money he was getting; that he had determined not to delay the receipt of the money by saying anything which would prevent the payment to him; that he intended to get a part of the price of the land from the defendants, and use that part to take from them the whole property. He may not have been aware that this intention was palpably dishonest; but the law will correct his principles of morality.

There is scarcely anything in our jurisprudence which more readily commends itself to the moral sense of all, than this principle. Where a person has stood by and seen another purchase or improve under a mistake as to title, he has been concluded by his silence from afterwards claiming and recovering that property; and although there has been some difference of opinion as to some of such cases, yet where a man has actually advised and encouraged the purchase, he has uniformly been estopped from taking such property from such purchaser; and much more would it shock the moral sense if one was permitted not only to encourage a sale, but to receive the purchase money, and afterwards to keep that money and recover the property and improvements. The attempt has never succeeded; no man who has joined in selling a

[Wilson v. Bigger.]

bad title has ever recovered the property by a better title, concealed or afterwards purchased.   The guardian had power to act as to the appraisement of the land.   He might have accepted it at the appraisement and his ward been irrevocably bound, though to his ruin. *Gelbach's Appeal.*   It was no hasty proceeding of the guardian.   He first applied for a sale of the undivided fifth part claimed for his ward.   Finding, probably, that such undivided portion would not sell, except at a sacrifice, he waits until a proceeding was had for effecting a sale of the whole farm, and he joins the others and petitions for a sale; and at the end of fifteen years, the ward, after consulting his grandfather and in his presence, receives $366, which he knew came from the defendants, and then uses this money to deprive them of the whole; and this under an idea that he had *the legal title.*   The man who obtains a deed for a tract of land for which he is to pay £500, but never pays a cent, has a *formal* title, but holds as a trustee for the seller. To be sure, there are countries in which he might recover in ejectment; but there is always some other court or tribunal who will compel him to restore the possession until he pays the price agreed.   And if, as in this case, he joined in inducing an innocent purchaser to pay for and improve it, he will not be permitted to disturb such purchaser, or succeed by calling that a legal title which, though in form of law, was never an available title unless the price was paid, and, without that, was used fraudulently.

Judgment reversed.