## Williard *et al. versus* Williard *et al.*

1. The acknowledgment of the fact of a trust at any time amounts to a confession, and may be given in evidence.

2. In a transaction claimed to create a resulting trust, if there is nothing more than is implied from the violation of a parol agreement, equity will not decree the purchaser a trustee.

3. A mere declaration of one that he purchased for another, without any previous agreement or without any advance of money, raises no trust which equity will support.

4. A case is not within the Act of April 22d 1856, relating to resulting trusts, when the cestui que trust has possession while the statute is running. If the statute had begun to run, this would stop it; if possession had preceded the trust relation, it would not begin to run.

5. Two held land in common;—after their death, the heirs of one being minors, a division was made, and the parts were occupied by the heirs of each respectively: the part of the minors was sold as their ancestor's estate for his debts, and a balance of the purchase-money paid to their guardian. The court charged that if the division were equal and just, the sale and payment of the debts of the one ancestor would cause the heirs of the other to be substituted to his rights in the other part. *Held*, not to be error.

6. A fair partition, followed by a judicial sale of the entirety of one tenant in common, after division and a proper application of the money, would sever the possession, although the owners of one moiety were minors.

7. Where any person, even an infant, does that which by law he is compelled to do, he is bound.

8. Land bought for its timber descended on the death of the owner to his father for life; he took the timber off. *Held*, that there was no forfeiture for waste.

[Williard *v.* Williard.]

9. *It seems*, in a question of waste, that there is no distinction between profits drawn by the owner from timber where it is the source of profit, and profits from opened mines.

10. The privileges of a life-tenant are much greater under the laws of Pennsylvania than under the common law.

11. If the life-tenant's use of timber is wanton, or in excess of his just measure of right, the remedy of the remainder-man is by estrepement under the Acts of Assembly.

12. Whether forfeiture of a life-tenant for waste exists in Pennsylvania; *dubitatur*, per AGNEW, J.

October 31st 1867.  Before THOMPSON, STRONG, READ and AGNEW, JJ.  WOODWARD, C. J., absent.

Error to the Court of Common Pleas of *Indiana county :* No. 132, to October and November Term 1866.

This action was an ejectment by Sarah Jane Williard, Joseph C. Williard and David F. Williard, minors, by their guardian, Elizabeth Williard, against David Williard, Alexander Findlay, John Bortz and James Foy.  The writ was issued July 24th 1862 : the lot in dispute, containing about 38 acres, being the one-half of a larger tract, the title to which was originally in Osgood and Thomas, and which they, on the 27th of October 1847, by their agent C. C. Gaskill, agreed to sell and convey to Jacob Williard, as containing 70 acres, for $3 per acre ; $25 to be paid in hand, $25 on the 1st of May 1848, and the residue in four equal annual payments with interest ; the deed to be made when all the purchase-money should be paid.  On the articles were endorsed receipts of purchase-money as paid by Jacob Williard amounting to $176, the last payment having been made January 12th 1853.  Jacob died intestate in 1854, leaving a widow, Elizabeth Williard, and four minor children, of whom the three plaintiffs are the survivors.

After the death of Williard his administrator paid the balance of the purchase-money to C. C. Gaskill, who had become the owner of their legal title to the land which Williard had contracted to buy of Osgood & Thomas, and on the 10th of May Gaskill made a deed for it to Elizabeth Williard in trust for the plaintiffs, describing it as containing 72 acres.

Having proved these facts on the trial the plaintiffs rested.

The defendants deduced their title from John Williard, a brother of Jacob, who in July 1852 died intestate, unmarried and without issue, leaving to survive him his father, David Williard, one of the defendants, his mother and a sister and brothers, of whom Jacob was one.  They alleged that the 70 acres were bought in common by Jacob and John and that the portion in dispute was held in trust for John's heirs.

Under objection and exception by the plaintiffs they gave evidence by Charles R. White, the administrator of John, that both

[Williard v. Williard.]

Jacob and John had told him, after the purchase, that they had bought the land together and told him the price; that after John's death, when the appraisers of his estate were about making the inventory, Jacob was at the house with some account-books and papers relating to John's business; that the witness and Jacob settled; Jacob accounted for some rafting and then said he would take in the payments on the land, and on calculating he found that John had overpaid his half by $40; he took out $1 to pay for John's share of the cost of the deed, and settled it at $39; he said that there was some more to pay on the land yet, but told the witness not to pay more than a balance of $5, which would be due after accounting to him, Jacob, for some work he had done; "for John had paid his part and more as fast as it fell due;" that Jacob also said that the article was in his name, but that John's should have been in it; Jacob told witness more than once to recollect that John had paid his part of the first money or all of it. Jacob further said that when he had discovered that John's name was not to the article, he told John that he had better sign his name, that John had said they were both honest and it would do to put his name in the deed when it was made; Jacob offered half the land to the witness as administrator, who thought he had nothing to do with the land; they agreed to refer it to counsel and they came to the conclusion that the deed should be made to Jacob and his father. John made the same statements to the witness about the contract for the land; John and Jacob made them separately and also together; the lot was bought for a timber lot and there was a raft cut on it at John's death, half of which was, by Jacob's return of it, appraised to John's estate and the other half retained by Jacob. On his death-bed Jacob said to the witness that he was going to die and that witness knew all about his and John's matters, and wished him to see to them. The appraisers of John's estate gave substantially the same testimony as to the occurrences at the time of the appraisement.

A tax collector saw them both about the payment of tax on the land, they told him they had bought the land in partnership and it made no difference which paid the tax. A number of other witnesses testified to similar declarations by both brothers when together and also separately.

There was also evidence that $100, part of the purchase-money endorsed on the article as paid by Jacob, was paid by timber from the land and that the land was of little value but for the timber.

The defendants proposed to prove that by agreement between the guardian of the plaintiffs and David Williard, the defendant, partition had been made of the land, a division line run and marked on the ground, that possession was taken by the parties

[Williard *v.* Williard.]

of their respective parts and has since been used by them in severalty ; that the part laid off to Jacob's heirs was sold by order of the Orphans' Court for the payment of his debts, and that the surplus of the proceeds was paid to the guardian of his children.   This offer was overruled by the court.   The defendants then offered to prove that " the tenancy in common was always recognised by the brothers and that they proposed and agreed to make partition between the heirs of John and the heirs of Jacob, that by proceedings in the Orphans' Court and Court of Common Pleas, the holding in common was admitted by the defendants." The court ruled as follows :—

" So far as this proposition and the former one propose to prove a parol partition after the death of Jacob they are overruled ; so far as regards the sale of the right of Jacob by order of the Orphans' Court to the extent of the sale they are admitted."

The defendant then gave in evidence the record of the Orphans' Court showing a sale of 100 acres of land as the estate of Jacob Williard, by his administrator Alexander Findlay, for the payment of his debts, to Elizabeth Williard for $645 ; and the settlement of the final account of the administrator, showing a balance of $245.78 due the estate which was paid to the guardian of the children.   The defendants also proved that the tract of 100 acres included 38 acres, that part of the tract conveyed by Gaskill to Williard, which had been set apart to Jacob's heirs by the division between the guardian and David Williard.  Findlay, about 1856, bought from David Williard John's part and Bortz bought of Findlay.  Findlay and Bortz have occupied it since ; and the heirs of Jacob had not had anything to do with it.   David Williard cut timber from the lot ; Findlay also cut timber from it ; all the timber but the refuse was taken from it under their authority.

The plaintiffs requested the court to charge the jury :—

1. That the parol evidence is insufficient to establish a resulting trust in David Williard, the defendant, to any part of the land in controversy, as the heir of John Williard, deceased.

2. That if the court are of opinion that this parol evidence, if believed by the jury, is sufficient to establish a resulting trust in favor of the defendants for a part of the land, the 6th section of the Act of 22d of April 1856 is an absolute bar to his right, and the plaintiffs are therefore entitled to recover the entire tract.

3. That if David Williard has any interest in the land, he holds as tenant in common with plaintiffs, and that if the jury believe that he took exclusive possession of the land or any part thereof, and by his acts or the acts of those claiming under him prevented the heirs of Jacob Williard from the enjoyment thereof, the plaintiffs are entitled to recover in this action.

[Williard *v.* Williard.]

4. That if David Williard was entitled as tenant in common with plaintiffs as the heir of his son, John Williard, deceased, he could have no greater interest than a life estate, and if the jury believe that he cut and removed the timber, which was the principal value of the land, it was the committing of such waste as worked a forfeiture of his interest, and therefore the plaintiffs are entitled to recover the two undivided thirds of the land in controversy.

The court (Buffington, P. J.) answered all the points in the negative.

The court further charged:—* * * "We are asked to say, however, that the proof of payment by John after the purchase will not do. We are of a different opinion if paid on the footing of the contract with Mr. Gaskill. * * * If the trust is made out and they were tenants in common, and if Jacob's heirs are entitled to recover their undivided part of the present lands, then John's heirs would be entitled to recover their undivided half of the land sold for the payment of Jacob's debts. This would create great confusion, and be very inconvenient, and under such circumstances if the entirety of one-half the land was treated, by all parties capable of acting, as Jacob's land, and as such sold by decree of the Orphans' Court, and the whole proceeds going to Jacob's debts, equity would substitute John's heirs to the rights of Jacob in the balance of the land. This would be equal and just, and save the rights of the purchaser of Jacob's interest; and if fair and equal, would vest in equity the whole of the land in dispute in the father, the heir of John."

The verdict was for the defendants, and the plaintiffs took a writ of error. Their 1st, 2d, 3d and 4th specifications of error were respectively the answers of the court to their points. The 5th and 6th specifications were the above portions of the charge.

*H. W. Weir*, for plaintiffs in error, cited Lloyd *v.* Lynch, 4 Casey 423; Robertson *v.* Robertson, 9 Watts 32; Bear *v.* Whisler, 7 Watts 147; Barnet *v.* Dougherty, 8 Casey 372; McBarron *v.* Glass, 6 Casey 134; Brawdy *v.* Brawdy, 7 Barr 157; Poorman *v.* Kilgore, 2 Casey 371; Kellum *v.* Smith, 9 Id. 164; Act of April 22d 1856, § 6, Purd. 654, pl. 13, Pamph. L. 532; Miller *v.* Franciscus, 4 Wright 341; Rider *v.* Maul, 10 Id. 380; Strimpfler *v.* Roberts, 6 Harris 283; Law *v.* Patterson, 1 W. & S. 191; McMahan *v.* McMahan, 1 Harris 383; 2 Rep. 302; 10 Bacon's Ab. 445.

*S. M. Clarke* and *W. M. Stewart*, with whom was *H. D. Foster*, for defendants in error, cited Beck *v.* Graybill, 4 Casey 71; Blyholder *v.* Gilson, 6 Harris 134; Morey *v.* Herrick, Id. 123; Raybold *v.* Raybold, 8 Id. 308; Lynch *v.* Cox, 11 Id.

[Williard *v.* Williard.]

269; Brightly's Eq. § 316; Kirkpatrick *v.* McDonald, 1 Jones 391; Clark *v.* Trindle, 2 P. F. Smith 492; Act of 22d April 1856, § 6 (*supra*); Miller *v.* Franciscus, 4 Wright 340; Stuckey *v.* Keefe, 2 Casey 399; Bates *v.* Seely, 10 Wright 248; Rider *v.* Maul, Id. 379; Calhoun *v.* Hays, 8 W. & S. 132; McConnell *v.* Carey, 12 Wright 349; Lynn's Appeal, 7 Casey 44.

The opinion of the court was delivered, January 7th 1868, by AGNEW, J.—The 1st and 5th assignments of error involve the quality and sufficiency of the evidence given in support of the trust in Jacob Williard for his brother John. Before the passage of the Act of 22d April 1856, parol evidence was always received of trusts, expressed or implied. This is not denied as the general rule, but it is contended that declarations of the alleged trustee made after the origination of the trust are not competent. The question is a decided one, and arose in Gregory's Lessee *v.* Salter, 1 Dall. 193, in which it was determined that an acknowledgment of the fact at *any* time amounts to a *confession* which may certainly be given in evidence. That case was followed by Gorman *v.* Gabbald, 3 Binn. 302, in which the point was very fully considered, and the reason for the competency of parol evidence stated to be founded in the omission from our Act of 1772 of the 7th and 8th sections of the English statute (29 Charles 2, cap. 3), the same now substantially as the 4th section of the Act of 22d April 1856. Then came Wallace *v.* Duffield, 2 S. & R. 521, which reaffirmed the doctrine of Gregory *v.* Salter and Gorman *v.* Gabbald, and held also that although a resulting trust might not arise from the character of the fund employed in the purchase (part of it belonging to the executor himself), yet when coupled with his declaration that he had purchased in trust for the family, a trust must certainly be raised; and that no difficulty would occur from the fact that part only of the purchase was paid from the funds of the testator; the trust in such case being in proportion to the fund so employed. After the decision in Robertson *v.* Robertson, 9 Watts 32, Justice Rogers, who delivered the opinion in that case, fully admitted the efficacy of parol evidence in the establishment of a proper trust: Jackman *v.* Ringland, 4 W. & S. 150; see also Morey *v.* Herrick, 6 Harris 128; Lynch *v.* Cox, 11 Harris 268; Beck's Executors *v.* Graybill, 4 Casey 71. In Kisler *v.* Kisler, 2 Watts 323, a well considered and a leading case, the late Chief Justice Gibson brought into view very distinctly the difference between a proper trust entering into an estate at the time of the conveyance and "a condition or agreement subsequently fastened on the title by the grantee;" fully conceding the competency of parol evidence to prove the former by way of the confession of the trustee of

[Williard v. Williard.]

the facts as a groundwork for the legal implication. Since Kisler v. Kisler, all the cases, and they are numerous, take the distinction between facts which constitute a trust entering into the estate at the time of its acquisition, and those merely indicating a contract to convey whether made before or after the purchase. The language of the cases was almost run into a *formula*, in which it is said "but where there is nothing more in the transaction than is implied from the violation of a parol agreement, equity will not decree the purchaser a trustee: Jackman v. Ringland, *supra;* Sidle v. Walters, 5 Watts 389 ; Robertson v. Robertson, 9 Watts 36 ; Haines v. O'Connor, 10 Watts 313 ; Fox v. Heffner, 1 W. & S. 376 ; Smith v. Smith, 3 Casey 180 ; Lloyd v. Lynch, 4 Casey 423 ; McBarron v. Glass, 6 Casey 134 ; Ketchum v. Smith, 9 Casey 164. These cases are cited also to show that we are not unmindful that a mere declaration of one that he purchased for another, without any previous agreement or without an advance of money, raises no trust which equity will support.

Ten witnesses prove conclusively the declarations of Jacob and John Williard that they bought this land in partnership, as they expressed it, and that each was to have the half of it. To some of the witnesses the declarations were made by both when together, and to some by each separately, and to all of them by Jacob. To three of the witnesses Jacob said distinctly that John had paid his half of the purchase-money as it fell due. Some of the conversations were not casual, but occurred at times, and upon occasions when it became necessary to speak the truth. Adam Tiger, the tax-collector, called for their tax, and saw them both. They said they had bought the land in partnership, and it made no difference which paid the tax. When Charles K. White, the administrator of John, was making the appraisement in 1852, Jacob came there and gave in one-half the land as John's. On being informed that the real estate was not to be inventoried, he then gave in John's half of a raft of timber cut on the place. At the same time, in presence of White and two others, one of them an appraiser, he stated that John owned one-half of the land, and had paid more than half of the purchase-money ; that he had paid up his share, at first, as it fell due, and more. He then entered into a settlement with the administrator, gave in certain accounts as to the rafting of the timber cut upon the land, and then the payments on their purchase, and on making the calculation it was found that John had overpaid his half forty dollars. From this sum Jacob deducted one dollar to be paid by John for writing the deed, which had not yet been made. During the conversation he said he had discovered that Gaskill had not put John's name in the article, and on telling John of it, said that he had better sign his name to it. John replied no, they were

honest, and it would do to put his name in the deed when they would get it. John had told White, the witness, the same thing. Both John and Jacob told persons they had bought the land for the timber, and connected with this there was proof that both cut timber on the land for rafting, and made sales of it. Jacob and White, the administrator, consulted Mr. Barclay as to the making of the deed, and it was arranged that it should be made to them jointly: the making of the deed being delayed to enable Jacob to buy out his father's life estate. Jacob told White if anything happened to him to remember their conversations, and on his death-bed said to him, "you know all about how our matters stand." Taking a survey of all these facts, it is impossible to doubt that there was full proof of an agreement between Jacob and John to buy this land together; of their equal interest in it, the payment by John of his share of the purchase-money, their joint use of the tract as a timber tract, and of the entire willingness of Jacob to carry out the trust; and that the deed was made after his death, in violation of this intent.

The point raised by the 2d assignment of error is that the trust is barred by the 6th section of the Act of 22d April 1856, which operates as a statute of limitations after five years from the accruing of the trust, or, in this case, from the end of two years after the passage of the act. But the proof shows very clearly that possession was taken under John's title by himself and also by his father before 1856. John dying unmarried and without issue, his estate descended to his father and mother for life. David Williard, the father, sold his title to Alexander Findlay, who was in possession and taking off timber in the year 1856; and the proof is clear that John Brady, a tenant of Mr. Findlay, has lived on the land since 1857 or 1858. The case falls therefore within the ruling of Clark *v.* Trindle, 2 P. F. Smith 492. It is there said by Justice Thompson that a case is not within the words of the statute, or the mischief intended to be remedied, when the *cestui qui trust* has possession and occupancy during the period when the statute is running. If the statute had begun to run, this would stop it. If possession preceded the trust relation, it would not begin to run.

The third question in the natural order arises under the 6th assignment of error. It was contended that, admitting the trust, it would be confined to the undivided half of the 38 acres in suit. This was the one-half of the whole tract. But the court held, under the circumstances, that the title of John's heirs extended to the entirety of these 38 acres. The circumstances were these, premising that the evidence of the amicable partition, rejected at first on account of the nonage of the plaintiff, was afterwards received so far as it bore upon the effect of the Orphans' Court sale of Jacob's title:—After the division between David Williard

[Williard v. Williard.]

and the heirs of Jacob, David occupied the east side of the tract (that in dispute), and exercised acts of exclusive ownership until he sold to Alexander Findlay. Findlay then held exclusive possession by his tenants until the time of the trial. At September Term 1859, Alexander Findlay, the administrator of Jacob Williard, presented his petition to the Orphans' Court of Indiana county for the sale of Jacob's real estate, containing about 100 acres, for the payment of his debts. This embraced, with adjoining land, the 38 acres which had been laid off to Jacob's heirs. An order of sale being granted, the land was sold to Elizabeth Williard for $645, sale confirmed and deed made. Findlay, the administrator, settled a final account, showing a balance after payment of the debts, which he paid over to Elizabeth Williard as the guardian of the plaintiffs. The court left it to the jury to find, under the evidence, whether the division of the land was equal and just, instructing them, if so found, that the Orphans' Court sale and the payment of the debts of Jacob under these circumstances would in equity cause John's heirs to be substituted to the rights of Jacob's heirs in the other half of the tract. In effect this was to say that a fair and equal partition of the tract, followed by a judicial sale of the entirety of one tenant in common after division, and a proper application of the money, would sever the possession, even though the owners of one moiety were minors. We discover no error in this. A partition of land which merely lays it off in severalty differs wholly from an attempted transfer of the title, which destroys the owner's estate. The latter was the case in Warden v. Eichbaum, 2 Harris 121, where the estate of Matilda Elliot, an insane person, under committee, was sold at sheriff's sale illegally, and her committee received her share of the surplus. It was held that her estate was not divested, and no estoppel took place. But partition destroys no estate, though it severs the common relation : Goundie v. Water Company, 7 Barr 238. Hence judgment-creditors whose liens are prior cannot gainsay a partition fairly and equally made, but must follow the severed parts : Bavington v. Clark, 2 Penna. R. 124; Longwell v. Bentley, 11 Harris 103. In the former case, Justice Huston asserts that where any person, even an infant, does that which by law he is compellable to do, for instance makes equal partition, he is bound. In this he followed the language of Lord Mansfield in 3 Burrowes 1801, who, quoting Co. Litt. 172 a, says, " generally whatsoever an infant is bound to do by law, the same shall bind him, albeit he doth it without suit at law." A partition made by a husband was held good against the wife, and Justice Kennedy remarked that a fair and equal partition by husbands for wives and guardians for minors will be good and binding on all : Calhoun v. Hays, 8 W. & S. 127. The same doctrine was stated by Justice Bell in McMahan v. Mc-

[Williard *v.* Williard.]

Mahan, 1 Harris 380, citing numerous authorities besides Calhoun *v.* Hays. In the same volume, Darlington's Appropriation, this doctrine was again announced by Justice Bell. Under the Act of 7th April 1807 and its supplements, partitions may be had in the Common Pleas where the parties or some of them were minors, or where life estates are held by some of the parties, and even the demandant need not be seised of a fee simple : Bright. Purd. 1861, pp. 770, pl. 6, 774, pl. 26, 33, 775, pl. 34, 35. The heirs of Jacob Williard were therefore compellable to make partition. Thus it is clear when Findlay, the administrator of Jacob, sold the 38 acres occupied by Jacob's heirs under the partition, he did not found his proceeding upon a wholly void act, but on one which, if fair and equal (and this fact has been found by the verdict), was binding notwithstanding the nonage of the plaintiffs. The partition was at most only voidable at the election of the minor heirs of Jacob, and they, after the sale of their father's interest in the 38 acres laid off to them as an entirety and the application of the proceeds to his debts and payment to their guardian of the residue, were estopped from avoiding it. Their estate was legally converted to answer the superior demands of creditors while the partition continued in force and a several possession by them, so that an offer now to avoid it comes too late, if the partition was in fact fair and equal. A case nearly akin to this is that of McPherson *v.* Cunliff, 11 S. & R. 426–428. That was a case of Orphans' Court sale for payment of debts, and although the chief point on which the decision was rested was the conclusiveness of the decree of the Orphans' Court, yet the estoppel in equity was also asserted. See the remarks of Huston, J., on this point in Wilson *v.* Bigger, 7 W. & S. 125, a case which goes far to decide the one before us, though it had the additional element of a settlement of the guardian with his ward after arrival at age and payment to him of the moneys remaining unexpended arising from the sale. The general principle of estoppel by receiving a portion of the proceeds of the sale is decided in Adlum *v.* Yard, 1 Rawle 171 ; Stroble *v.* Smith, 8 Watts 280 ; Spragg *v.* Shimer, 1 Casey 282. Upon the whole, we think the court committed no error in this part of their charge.

The last question to be noticed is that raised by the 4th assignment of error. John having died without issue, his estate descended in part to his brother Jacob (the father of the plaintiffs), who is since dead. It was contended that John's father, David, had forfeited his life estate by waste, and that the plaintiffs, as heirs of John in remainder, were entitled to recover their father's undivided share. In considering the question of waste by a life tenant, respect must be had to the nature of the property. Here the evidence proves clearly that the tract was bought by

[Williard v. Williard.]

Jacob and John as timber land, that this was its chief value, and that they were both engaged in cutting and rafting timber from it. The timber was the intended source of profit, and the parties treated it accordingly. It is difficult to draw a distinction in this respect between profits actually drawn by the owner from the timber where it is the source of profit, and profits drawn from opened mines. Timber is no more a fixed part of the realty than coal or other minerals, and yet a life tenant may mine without limit from opened mines. This subject was well examined in Neel v. Neel, 7 Harris 323, and Irwin v. Covode, 12 Id. 162. The latter case carries the doctrine to a great extent. In Lyman's Appeal, 7 Casey 44, it is said the privileges of a life tenant are much greater under the law of Pennsylvania than those recognised by the common law of England. If he exceeds them, the Act of 10th April 1848 gives the remainder-man a right to apply to the Court of Common Pleas for a writ of estrepement. The act declares that the tenant for life shall not be restrained from the reasonable and necessary use and enjoyment of the land and premises in his or her possession; and that the Court of Common Pleas shall have power to inquire into and determine the nature and extent of said use and enjoyment, upon any motion to dissolve the writ. Going back to Hastings and Wife v. Counckleton, 3 Yeates 260, it was there held that a tenant in dower may clear woodland, provided she does not exceed a just proportion of the whole.

The court remarked there was a material difference between the local circumstances of this state and Great Britain, and it would be an outrage on common sense that what would be deemed waste there could receive that appellation here. We know that the pine lands of this state are often valuable only for their timber, and are bought solely for this use. This appears to have been the character of the land in question; and, looking to the use and purpose to which it was put by Jacob and John Williard, it would be saying too much that the same use on part of David Williard, the life tenant, would incur a forfeiture of estate. It is rather such a case as would call for the interposition of the court upon a writ of estrepement, at the instance of the remainder-man, if they deemed his use wanton destruction or in excess of his just measure of right. I remember of no case of forfeiture of a life estate by waste expressly decided.

Forfeitures are not favored; and, looking at the condition of the country, the habits of the people and the ample statutory remedies provided, it may be doubtful whether the doctrine would be held to be applicable to our circumstances. But without deciding so much, we hold in this case that there was no forfeiture under its circumstances.

The disposition made of the other questions in the cause ren-

6 P. F. Smith—9

[Williard *v.* Williard.]

ders the 3d assignment of error immaterial, and upon the whole case the judgment is affirmed.