STROH *v.* O'HEARN.

1. WILLS—LEGACIES—ESTATES OF DECEDENTS.

Under provisions of a will, bequeathing to two of decedent's daughters $500 each, "to be paid from the proceeds of testator's farm as soon as it will admit, or at the pleasure" of testator's widow, but within five years at farthest, the bequests were a charge upon the real estate and proceeds realized therefrom by sale, although the will devised the real property to other beneficiaries.

2. SUBROGATION—MISTAKE—EQUITY JURISDICTION—MORTGAGES.

Where complainant and one of the defendants asking affirmative relief, respectively advanced funds as a loan upon real property and to purchase land belonging to the estate of a decedent, mistakenly supposing that certain children of deceased had a complete title in fee to the realty sold and mortgaged, by conveyance of such children, and where the money realized was employed in paying off incumbrances against the estate property, and in paying certain legacies that the will provided for, complainant and such purchasing defendant were entitled in equity to be subrogated to the rights of the mortgagee who received payment out of the funds advanced by them.

3. SAME.

The granting of subrogation is an equitable remedy, applicable when persons other than mere volunteers pay a debt or demand that in equity and good conscience should have been satisfied by another, and it is proper in all cases where injustice would follow *its* denial.

4. WASTE—LIFE ESTATE—LOGS AND LOGGING.

Life tenants may not convey the timber on real estate, as against the rights of remaindermen, granting, at the same time, permission to remove the timber within five years: the transaction amounts to waste, and is invalid.

5. LIFE ESTATES—INCUMBRANCES—MORTGAGES—INTEREST.

It is the duty of the life tenant, whose estate is subject to a mortgage upon the fee, to discharge the interest; and the remaindermen are charged with the duty of paying

the principal. If the life tenants pay the incumbrance or mortgage, they may call on those having title to the remainder for contribution; if the reversioner satisfies the incumbrance when it becomes due, the life tenants may be required to contribute as their share the interest on the amount paid, based on the term of the life estate.[1]

6. SAME—IMPROVEMENTS.

Improvements made by a life tenant, being presumed to be made for his own benefit, are not chargeable to the remaindermen.

7. SUBROGATION—EQUITY.

In granting subrogation to complainants, they should be placed, as nearly as possible, in the condition existing at the time they acquired their interests, and should have a lien only to the amounts paid in satisfaction of the preceding incumbrances.

8. RECEIVERS—ESTATES OF DECEDENTS—LIFE ESTATES.

Upon a showing that an estate in process of probate has been mismanaged, incumbrances executed upon the interests of life tenants who mistakenly assumed to have a fee, that default has been made in the satisfaction of debts and legacies due from the estate, and in interest upon mortgages outstanding against the same, equity may enter a decree appointing a receiver.

9. SUBROGATION—FORECLOSURE OF MORTGAGES.

Proceedings taken by one of the complainants to foreclose his mortgage by advertisement, instituted subsequently to filing his bill for subrogation, which submitted to the court of chancery the entire matter of mortgage foreclosure and his right to a lien, were insufficient to affect the rights of the parties, and could not dispose of any matters in issue in the equity suit.

10. EQUITY—JURISDICTION—ESTATES OF DECEDENTS.

Decedent devised a life estate in his property and estate to his wife, and, after her death, a life interest in specified parcels to his two sons, charging the entire estate with the payment of certain legacies. The sons attempted to

---

[1] As to the duty of a life tenant to keep property in repair, see note in 33 L. R. A. (N. S.) 669. And upon the right of a life tenant, or person claiming under him, to recover for improvements, see note in 13 L. R. A. (N. S.) 514. And as to the duty of a life tenant to pay taxes, see note in 32 L. R. A. 744.

convey the fee of separate pracels to one another, and to execute a mortgage upon one of the farms belonging to the estate, following the decease of the widow and termination of her life interest. Out of the proceeds thus obtained, the legacies were paid and an existing incumbrance on the farm satisfied, and one of the life tenants executed to a purchaser, who innocently and mistakenly supposed that he was obtaining a clear title, a deed of a sixty-acre parcel belonging to the estate. Other conveyances were made, and default occurred under the mortgage. Discovering the error and the actual state of the title, the mortgagee filed a bill as complainant to obtain subrogation to the rights of the previously existing and discharged mortgage, making the grantee above-named and another purchaser from one of the life tenants a party. *Held*, that the remedy of subrogation was a proper method of relief in favor of complainant and the purchaser of the sixty acres, that the defendant purchaser last named must be relegated to his action at law for breach of warranty, on the ground that the proceeds went to the grantors personally, and a decree is entered disposing of the entire controversy and remanding the estate to the lower court to be wound up and distributed.

Appeal from Ottawa; Padgham, J. Submitted January 16, 1913. (Docket No. 28.) Decided July 9, 1913.

Bill by Conrad Stroh against John O'Hearn, Joseph Bauman, and other defendants for subrogation. Said Joseph Bauman filed a cross-bill praying for affirmative relief. From a decree for complainant and said Bauman, defendants appeal. Modified.

*Farr & Kolyn*, for complainant.

*Hatch, McAllister & Raymond*, for defendants O'Hearn, *et al.*

*Charles E. Soule* and *C. Edward Soule*, for defendant Bauman.

STEERE, J. This suit involves a tangled tale of

misunderstanding, bad management, and bad advice in the administration of the estate of Dominick O'Hearn, formerly a farmer residing in the township of Tallmadge, Ottawa county, where he owned a farm of 180 acres, which is now the subject of this litigation. The accompanying plat of said farm may serve to more readily understand its shape and the relative location of the different parts now in controversy.

EXHIBIT I.
Map of Section 1, T. 7 N., R. 13 W.

On January 15, 1892, said Dominick O'Hearn, being the owner of this farm free and unincumbered, together with personal property of considerable value, executed his last will and testament in which he gave all his property, real and personal, except a span of horses to be set off to his son Frank, to his wife, Margaret O'Hearn, for life, and after her death the 120 acres south and west of the State road to his son John O'Hearn for life, and the 60 acres north and east of said road to his son Martin O'Hearn for life, and after their death to their heirs; also legacies of $500 each to his daughters Mary and Agnes, and $1 each to his daughters Lizzie and Mariah, "to be paid from the proceeds of the farm as soon as it will admit, or at

the pleasure of my wife, Margaret O'Hearn, should she survive that long, but in no case shall a payment be put off to exceed the term of five years;" also providing that after the death of Margaret all personal property that she possessed at that time should be divided equally between the two sons John and Martin. Said Margaret O'Hearn was appointed executrix of the will. Before his death, and after making this will, he and his wife, on April 9, 1894, gave a mortgage for $1,500 on that portion of the farm lying north and east of the State road. This mortgage, with accompanying notes, was proved before the commissioners on claims against his estate, and allowed.

Said Dominick O'Hearn died on September 7, 1898, his wife and said seven children surviving him, and his will was admitted to probate by the probate court of Ottawa county, on October 24, 1898. His widow, Margaret O'Hearn, was appointed administratrix, but did not qualify, and on May 2, 1900, Thomas Malloy was appointed administrator *de bonis non* with the will annexed. On June 5th Malloy, having duly qualified, filed an appraisal of decedent's estate, showing realty valued at $7,900, and personal property valued at $1,335. Commissioners on claims were appointed who, on December 7, 1900, made a report, which was confirmed, showing claims filed against the estate amounting to $3,148.99, in which was included said mortgage amounting, with interest, to $1,739. On March 4, 1901, the administrator, having obtained a license for that purpose from the probate court, sold a strip of land 3 rods wide from the 60 acres north and east of the State road, and adjacent to it, to an interurban railway for $150, and to Frank O'Hearn the northwest quarter of the southwest quarter of section 1, which had been appraised at $1,500 in the probate court, for $1,000, and also contracted to sell to Charles E. Chappell the remainder of the 60 acres north and

east of the State road for $1,900. That latter sale was
not consummated, a payment of $50 being forfeited,
but the other sales were duly confirmed by the probate
court, and the purchase prices paid to the administra-
tor. The administrator also sold a team of horses for
$125, and other personal property. The proceeds of
these sales were used in payment of the debts of the
estate and expenses of administration.

Following this, on May 27, 1901, the administrator,
having applied to the probate court and obtained per-
mission to mortgage, for the purpose of paying debts,
the northwest quarter of section 1 lying south and
west of the State road for $1,050 (which had been
willed to John for life and after his death to his heirs),
and the 60 acres lying north and east of the State road
(willed to Martin for life and after his death to his
heirs) for $1,000, borrowed from Charles E. Chappell
the sum of $2,050 at 6 per cent. interest, payable an-
nually, $600 to be paid on the principal June 1, 1904,
$600 June 1, 1905, and the balance of $850 June 1,
1906, securing the same by two mortgages on said
property. To these mortgages the widow and all chil-
dren of deceased consented in writing. The mort-
gages were made subject to the life interest of Mar-
garet O'Hearn, the widow of deceased. At this time
the legatees and devisees named in testator's will were
all living, and their names were as follows: Margaret
O'Hearn, widow; John, Frank, and Martin O'Hearn;
Mariah (O'Hearn) Hall, Elizabeth (O'Hearn) Butch-
er, Agnes (O'Hearn) Loftus, Minnie (Mary O'Hearn)
Stroh; the then living prospective heirs of John
O'Hearn, who was unmarried, were his six broth-
ers and sisters; the prospective heirs of Martin
O'Hearn were three children, Harold, Mabel, and
Richard; since then another child has been born
to him. The contingencies as to remaindermen, from
births, marriages, and deaths, are practically un-
limited.

On June 11, 1901, the administrator rendered his final account, which was allowed by the probate court on July 8th following. This showed that the administrator had paid total debts of $3,219.92, had expended incurred expenses and administration amounting to $204.08, had lost on sale of real estate, from the appraisal, $500, and had personal property on hand valued at $1,231, with real estate unsold valued at $6,150. The order of the probate court required him to turn the estate over to Margaret O'Hearn, the widow, to be enjoyed and used by her as provided in the will, after which he should be finally discharged.

On May 30, 1903, Margaret O'Hearn, widow of Dominick, died. On July 3, 1903, said mortgages were foreclosed in chancery by said Chappell for default in payment of interest, the administrator and several legatees in the will being made defendants, and a decree by default was taken, not for the principal, but for interest only, amounting to $133.15 on one mortgage and $126.84 upon the other, there being no provision in the mortgages for declaring the principal due on default in interest. No sale was had on these foreclosures. The matter was allowed to rest in that shape until March 19, 1904, when the condition of the estate had become such that it seemed imperative something should be done, and upon the advice of certain parties the complainant, Conrad Stroh, together with his wife, who was the Mary O'Hearn named as one of the legatees in the will, and Martin O'Hearn, John O'Hearn, the daughter Lizzie O'Hearn, and Joseph Bauman, a defendant herein and complainant by cross-bill, together with Charles E. Chappell, the mortgagee, met at the office of an attorney, who was Mr. Chappell's solicitor in the mortgage foreclosures, and had a conference resulting in an apparently unintentional juggling of titles in which Martin O'Hearn and his wife conveyed by warranty deed the 60 acres north

and east of the State road to Joseph Bauman, except-
ing therefrom the strip sold to the railroad, for $2,200;
John O'Hearn conveyed by warranty deed to Martin
O'Hearn an undivided one-half interest in that part
of the northwest quarter of section 1 lying southwest
of the State road, which contained the buildings of the
O'Hearn farm, and said John and Martin O'Hearn,
and wife, gave to complainant, Conrad Stroh, a mort-
gage on said last description, for $1,300. In connec-
tion with this transaction Martin O'Hearn and John
O'Hearn together sold and deeded to said Stroh the
timber on a portion of the land, on which they held
a life estate, for $350, with five years' time in which
to remove the same. The result of the transaction
was that Stroh and Bauman together contributed
$3,825, out of which was paid $2,309.99 in liquidation
of the Chappell mortgages, and $1,000 in payment of
the legacies to the two daughters Mary and Agnes,
making a total of $3,309.99 applied in paying debts
of the estate. At this meeting neither Frank, Mariah,
Agnes, nor the children of Martin O'Hearn were pres-
ent or consented to what was there done. No order
was made by the probate court directing the payment
of said legacies, but receipts for the same were duly
filed in said court. All parties to this transaction
manifestly acted upon the assumption that John and
Martin O'Hearn had complete titles to the portions
of the real estate which they conveyed, instead of life
leases. It is conceded that Bauman believed he had
purchased a complete title, and that John O'Hearn and
Martin O'Hearn understood that Martin had acquired
complete title to an undivided half of the 80 acres
southwest of the State road, and complainant, Stroh,
believed that the mortgage and the deed of the timber
given to him were based upon a title in fee simple.

The titles to this property were further confused by
the following conveyances: On January 25, 1906,

complainant Stroh reconveyed to John and Martin O'Hearn the timber he had purchased from them, and received from Martin O'Hearn and wife and John O'Hearn a mortgage for $600 "on that part of the northwest quarter of said section one of said Tallmadge township." This mortgage was not recorded but on October 8, 1906, Stroh surrendered the same to John and Martin, receiving from them a mortgage on the same premises for the sum of $730, the consideration being a surrender of the first mortgage, with accumulated interest, and an additional loan of $100 in cash. On November 27, 1906, Bauman gave a warranty deed, for a consideration of $950, to William W. Nash and wife, defendants herein, of a portion of said section 1, described as beginning 100 feet east of the northwest corner of said section, thence east 961 feet, thence south 906 feet, thence west along the right of way of the interurban railway 1,312 feet to the place of beginning, and on the same date said grantees mortgaged the same to an outside party for the sum of $600; said mortgage being yet unpaid. On October 27, 1907, a house located on the property purchased by Nash and wife from Bauman burned, without insurance.

It is undisputed that at the death of Dominick O'Hearn all of his children were over 21 years of age; that neither Martin O'Hearn nor John O'Hearn are financially responsible, nor have property of substantial value other than their interests in this estate; that Frank O'Hearn and Mariah, the sister, are financially responsible aside from their interests in the estate. John O'Hearn was born in 1848, and is unmarried; Martin O'Hearn was born in 1865, is married, and has four children, the eldest having been born in 1894 and the youngest in 1906.

Defendant Bauman, after receiving his conveyance and making payment, as already stated, immediately

took possession of the land described in his conveyance, and made improvements thereon of some value and of permanent character, in the way of fencing, ditching, fertilizing, etc., and remained in possession of the same up to the time of the hearing in this case, except the tract, of about 10 acres, which he sold to defendants Nash. It is his claim and testimony that he made betterments to the extent of $961, which is disputed, the value of the same, as shown by the testimony of Frank O'Hearn, being about $361. It is, however, undisputed that he bought the land in good faith for full value, paid for the same, took possession, improved and worked it as his own, believing that he held title thereto in fee simple.

It is manifest from this record that not only did the adult beneficiaries of Dominick O'Hearn's estate, who had control and possession of the property, lack thrift and business ability to properly conserve the assets and protect their own interests and those of their kin who were to follow them, but many errors and irregularities crept into its management while in the hands of the administrator, going through probate. Real estate was sold and mortgaged by authority of the court to pay indebtedness while there was yet personal property undisposed of, mortgages of different amounts were given on different parcels of the estate, with no attempt to adjust the rights of the respective devisees by contribution, or to apportion the burden of the indebtedness on the respective interests.

At the time Stroh and Bauman became interested in this property, on the 19th of May, 1904, the situation was substantially as follows: A legacy of $500 to each of decedent's two daughters, which was a lien upon the estate, was yet unpaid, and the five-year period in which the will provided that it should be paid had already elapsed. Eighty acres of the realty was under a mortgage of $1,050, given by the admin-

istrator under authority of the probate court to one Chappell, to raise money to pay debts of the estate, and another tract of 60 acres was under a mortgage of $1,000, given in like manner. Both these mortgages had been foreclosed, decrees of foreclosure had been rendered in a chancery court, and the time for sale had arrived, and a 40 acres had been sold for like purpose. The 80 acres in question had been devised to John O'Hearn for life, and after his death to his heirs; and the 60 acres likewise to Martin O'Hearn for life, and after his death to his heirs. Under these conditions Stroh and Bauman, previously disinterested parties, except as Stroh was indirectly interested through his wife, were somehow led to participate in a meeting, held by certain beneficiaries and a creditor, to devise means for relieving the situation, at which meeting legal counsel was present, and to invest their money as heretofore stated. It cannot be said from this record that they were meddlers and interlopers. The testimony shows that Stroh, by reason of his family relations, was induced to participate in an attempt to save the estate, and Bauman, a thrifty neighbor, who had more than once previously been solicited by a member of the family to purchase part of this estate, was induced to enter into the deal, and did so as a legitimate business transaction, buying what he supposed was a good title to a piece of land, as an investment, paying full price therefor, as already shown.

The parties to this suit have filed elaborate pleadings, bill of complaint, amended bills, answers, cross-bills, answers to cross-bills, etc.; by stipulation and otherwise all parties are before the court and all questions raised are in issue by appropriate pleadings.

The legal rights of, and relief sought by Stroh and Bauman are similar, and they are working in harmony for practically the same end. It is alleged and argued in their behalf that they are entitled, by reason of an

honest mistake, not only on their part but of all parties participating, to be subrogated to the liens of the Chappell mortgages and the legacies to the daughters, to the amount which they have paid to relieve the estate of those burdens, in proportion to the money advanced by each, and that they should be granted foreclosure therefor, otherwise leaving existing conditions undisturbed.

On behalf of the heirs and beneficiaries under the will it is argued that the legacies to the daughters create no lien against the estate, that no subrogation can arise, because Stroh and Bauman were mere volunteers gratuitously paying the debt of another; and it is most seriously contended that, under the peculiar complications and conditions which have arisen, there being contingent remaindermen now undetermined, even to the possibility of some yet unborn, the only way in which this snarl can be equitably untangled and the rights of all parties protected is by granting the special relief prayed for in the answers and cross-bills, to the full extent of decreeing that all deeds, mortgages, and mortgage sales affecting title to the lands of the estate of decedent as it stood prior to March 19, 1904, be set aside, and this court direct that the assets of said estate be marshaled and contribution imposed, under the direction of the circuit court of Ottawa county, for the purpose of conserving the assets of the estate and paying such debts and legacies as may be found a proper charge against it.

We are well satisfied that the legacies to decedent's daughters are a burden on the estate. They were to be paid from the proceeds of the farm, and it is suggested that this means income, or usufruct, only. If there was nothing contained in the will beyond this, that view might be possible. Although the will authorized a postponement of their payment as a convenience to the estate, it was "in no case to exceed the term

of five years." "Proceeds," as an ultimate contingency under such a provision, means "money obtained by the sale of property." *Birmingham* v. *Lesan*, 77 Me. 494 (1 Atl. 151). These were demonstrative legacies, and a charge against the land from which proceeds to pay them must be realized, either by income or sale, within five years. The gifts were so made as to clearly show testator's intention that the donees should, within a specified time, certainly receive the amounts bequeathed.

"If the language of the will indicates that the testator intended legacies to be paid, knowing that his personal estate would be insufficient for the purpose, or if it appear that in giving the legacies he had the real estate in mind, they will constitute a charge thereon although it be devised." Woerner's American Law of Administration (2d Ed.), *p. 1097, and cases cited.

The Chappell mortgages were given, to meet the needs of the estate, by the administrator under authority of the probate court, with consent in writing of the widow and children of decedent, for the express purpose of borrowing money to pay debts and expenses, which, when received, were so applied. So far as the lender was concerned, they were a valid, subsisting lien on all the realty which they covered. The matter of contribution was between the beneficiaries under the will, and no concern of his.

The mortgages had been foreclosed and sale decreed, and the legacies were past due and payable when Stroh and Bauman first became connected with the estate. They were in no way responsible for the conditions which had arisen. Under the apparent necessity of raising money to avoid a sacrifice of the entire estate and meet these pressing obligations, through innocent misrepresentation, and a misunderstanding all around as to the condition of titles, they advanced the money to pay off those liens, under the honest belief that they

were paying incumbrances on property bought or security taken, based on perfect titles. We think it is within the power of a court of equity to grant them subrogation, subject to such conditions as are just and equitable. They are not arbitrarily entitled to it as a matter of right, irrespective of equitable considerations arising in favor of other interests which may be affected thereby. Subrogation is an equitable doctrine depending upon no contract or privity, and proper to apply whenever persons other than mere volunteers pay a debt or demand which in equity and good conscience should have been satisfied by another. It is proper in all cases to allow it where injustice would follow its denial, and in allowing it all injustice should be guarded against so far as possible. We need not go afield in other jurisdictions for authority upon this subject; the law is well settled in this State. *Detroit Fire & Marine Ins. Co.* v. *Aspinall,* 48 Mich. 238 (12 N. W. 214) ; *Lockwood* v. *Bassett,* 49 Mich. 546 (14 N. W. 492) ; *Warner* v. *Hall,* 53 Mich. 371 (19 N. W. 40) ; *Kelly* v. *Kelly,* 54 Mich. 30 (19 N. W. 580) ; *White* v. *Newhall,* 68 Mich. 641 (36 N. W. 699) ; *Palmer* v. *Sharp,* 112 Mich. 420 (10 N. W. 903) ; *Dayton* v. *Stahl,* 132 Mich. 360 (93 N. W. 878) ; *Sproal* v. *Larsen,* 138 Mich. 142 (101 N. W. 213) ; *Taylor* v. *Roniger,* 147 Mich. 99 (110 N. W. 593).

In the last-mentioned case Taylor purchased land in good faith believing that he was acquiring a perfect title thereto, and paid a valid mortgage thereon, subsequently losing the land by reason of the title not being in his grantors; the court, in disposing of this question, said:

"Complainant purchased the land for $300 cash, understanding that he was obtaining the title in fee subject to the incumbrance. He paid the mortgage thinking he was relieving his own land from the incumbrance, and having paid the mortgage upon the land

which in fact he did not own became its equitable owner, and entitled to be so considered and to have the same declared to be a subsisting lien upon the land. A court in equity was the only forum having jurisdiction to determine these questions. * * * The court had jurisdiction of the parties and of the subject-matter of the suit, and under the general prayer for relief could make such decree as equity demanded."

In *Detroit Fire & Marine Ins. Co.* v. *Aspinall, supra,* money borrowed by an administratrix, under authority from the probate court, though the court exceeded its powers in granting such authority, was applied to the payment of a debt secured by mortgage upon real estate, and the mortgage was discharged. It appeared that all proceedings relating to the loan, being under color of authority from the probate court, were in good faith, and the estate had the benefit of the money. The complainant asked to be subrogated to the rights which the holders of the mortgage would have had if it had not been paid and discharged. This court there said:

"The complainant does not stand in the light of a stranger or volunteer paying the debt of another without authority, nor as one merely loaning money to pay off a debt. The complainant's equities do not stand upon any such ground; but because of the mistake of all parties, who, acting in good faith and under color of authority, paid an existing obligation against the estate under an agreement that they should have security upon the estate, it is therefore equitable that the property thus saved to the estate should now, in part at least, respond to the claim of the complainant."

Is it possible, or just and equitable, to grant subrogation and order foreclosure, leaving other complications resulting from the mistake undisturbed?

After Stroh and Bauman became connected with this estate, and the various conveyances mentioned had been made, Bauman, by the records, was the owner of a life estate only, in the land north and east of the

State road, except that portion previously sold to the interurban railway and the 10 acres sold by him to Nash and wife, to whom he conveyed but a life estate. This life estate was not for their own lives, but that of Martin O'Hearn. Martin and John O'Hearn together owned an estate for the life of John in the 80 acres south and west of the State road. Their timber deed to Stroh authorized waste of the fee, and was invalid. The $1,300 mortgage on the 80 acres, given by John and Martin to Stroh, was not an incumbrance on the fee, but only on the life estate they held, which would terminate at the death of John.

The legacies to the two daughters and the mortgages held by Chappell were paid and discharged. These two mortgages had been foreclosed and sale decreed because of default in payment of interest. This was a default of the life tenants. Life tenants, while entitled to the possession and income of the realty, are obligated to pay taxes and the interest on mortgages and debts which are a lien upon the fee of the property. During the widow's life it was her duty to do this. After her death it devolved upon John and Martin. Had they paid this interest, the mortgages could not then have been foreclosed, for they were not yet due. It was the duty of the remaindermen, or owners of the fee, to care for the principal of any incumbrances upon the property; in case they did not do so, and the life tenants paid the same, or purchased the property at foreclosure sale, they could not acquire an adverse title against the remaindermen. While it was the duty of the remaindermen to prevent foreclosure and save the property, if the life tenants, being under no obligation to do so beyond paying interest, did pay the incumbrances, they would be entitled to call upon the remaindermen for contribution, and would have a lien upon the property for the amount so paid, less interest on the principal of the indebted-

ness, to be computed against them during the continuance of their life estate; if, on the other hand, the reversioners paid the indebtedness when due, the life tenants would be required to contribute as their share the interest on the amount paid, on the basis of its continuance during the life estate. *Whitney* v. *Salter,* 36 Minn. 103 (30 N. W. 755, 1 Am. St. Rep. 656); *Defreese* v. *Lake,* 109 Mich. 415 (67 N. W. 505, 32 L. R. A. 744, 63 Am. St. Rep. 584); *Damm* v. *Damm,* 109 Mich. 619 (67 N. W. 984, 63 Am. St. Rep. 601); *Plympton* v. *Boston Dispensary,* 106 Mass. 544; *Jones* v. *Gilbert,* 135 Ill. 27 (25 N. E. 566). Bauman took upon himself, when receiving his deed of a life estate, the burden of paying his proportionate share of interest on the indebtedness against the estate on the basis of the life of Martin.

"If the property is sold under foreclosure to satisfy an incumbrance, the life tenant may be a purchaser at the sale. He cannot, however, hold the title adversely, but will be deemed to have made the purchase for the benefit of himself and the remainderman or reversioner, in case the latter will contribute his share of the purchase price, and does so within a reasonable time." 16 Cyc. p. 618.

Bauman, having paid the mortgage, or any other lien, on the 60 acres he held as a life tenant, would himself have a lien thereon for the amount paid, deducting interest computed for the estimated duration of his life tenancy. As life tenant he was also required to pay the actual expenses of care and maintenance of the estate. Improvements made by him during his tenancy are presumed to be for his own benefit and, as a rule, not a charge against the estate or the remaindermen.

This is but a beginning of the complications which the manner of handling this estate and resulting condition of the titles develop for consideration if the interests and rights of the parties are to be adjudicated

on the basis of the conveyances as they now appear.

It is the claim of all parties to this litigation that the transactions of March 19, 1904, arose from a general misunderstanding, and were honest but unfortunate mistakes. The participants on both sides claim that had the true situation and condition of titles been then known and understood, that which was done would not have been done. They all ask in this suit, by bill and cross-bill, to be relieved from the consequences of the mistakes then made. The contention is over the extent and nature of the relief which should be granted. The inequity of the relief asked by Bauman and Stroh is that they desire to retain the benefits accruing to them from the mistakes made, and to be relieved of the harm. It is manifest that their interests and purposes are adverse to those of the remaindermen. It can fairly be inferred from the record that they are seeking to acquire title to this land and wipe out the reversionary interests. The hold which they have on the property through life estates acquired by the conveyances inadvertently given puts them in an advantageous position to that end, by making it more difficult for the remaindermen to harmonize interests and so adjust matters as to provide the necessary means to protect the estate, or, in case of sale, to realize an adequate price; and uncertainties of the contingent interests further add to that difficulty. In granting relief from the consequences of these mistakes, the rights and interests of all parties must be considered. We think it proper, and within the power of a court of chancery, to grant subrogation to Bauman and Stroh to the amount of the liens against the estate which they have paid, less the value of any benefits they may have received from the estate; but the subrogation must be in lieu of that out of which the mistakes, which justify the court in granting subrogation asked, arose. The mistakes ran

through the negotiations, agreements, conveyances, and payments of March 19, 1904, resulting in relieving the estate of the burden of the mortgages and legacies then paid. The reimposition of that burden must be accompanied by a restoration of then existing conditions as near as possible. With these conveyances canceled and subrogation granted, Stroh and Bauman stand in their relation to the estate as secured creditors only to the amount of the money they advanced in payment of liens against it. Their only right is to have their liens enforced with reasonable diligence. On this record under the relief granted they are not entitled to possession of the property.

The owners of the property, life tenants and remaindermen, all ask that it be taken in charge by the court, through a receiver, and sold, the debts paid, the assets marshaled, and contribution apportioned. Under the undisputed facts in this case, we think this request should be granted.

There are minor beneficiaries who appear by guardian. The protection of the rights of infants is always a matter of special concern in a court of chancery. The life tenants and remaindermen are in default in paying debts which are a lien on the land. They are manifestly incompetent or unwilling to care for the estate and conserve its interests. The history of its mismanagement so indicates, and they, in effect, admit it in their pleadings. The court of chancery has power to order such auxiliary proceedings to conserve the property in litigation from being dissipated and lost. The only objection to this course is from Stroh and Bauman. If their claims as creditors are satisfied within a reasonable time, their rights and legal interest in the estate end. It is shown that they contributed a fund of $3,825—Stroh $1,625 and Bauman $2,200—out of which $3,309.99 was applied in liquidation of liens on the estate, and they should stand sub-

rogated proportionately. Interest should be computed in their favor, together with any increase of value shown to have been added by them to the realty by reason of permanent improvements, and they should be charged with the rental value of any portion they have had in possession, which ultimately, in adjusting contribution between the beneficiaries, should be credited to the life tenants.

The singular record of this suit discloses that it was begun by Stroh in April, 1907, was heard and submitted in the trial court March, 1909, and finally decided in that court in December, 1911, after which an appeal was taken to this court. It is stated in the briefs of counsel that, after filing his bill of complaint, Stroh proceeded independently to foreclose by advertisement the $750 mortgage given him by John and Martin O'Hearn on the life estate of John in the 80 acres southwest of the State road, and has been in possession of said property for some time. This mortgage is set out in his bill of complaint, and the court asked to adjudicate his rights in that connection. The matter of subsequent statutory foreclosure is not properly presented here, by pleading or proof, but if it be shown in a supplemental proceeding that, after tying up this estate in the chancery court, he sought to forestall results and secure possession and enjoyment of a portion of the estate by thus assuming to dispose of a matter previously submitted by him to the chancery court, the foreclosure may be held for naught. The mortgage was proved at the hearing. While some remarks of complainant's counsel then made indicated a waiver of this claim, a fair inference is that no claim was made of right to assert it against the estate as an entirety. The same misunderstanding as to titles existed when it was given, though it was at a time subsequent to the payment of the mortgages and legacies. So far as shown, Martin and John received the

proceeds of it.  It is a personal liability of theirs, and a lien on John's life estate in the 80 acres subject to the prior liens of the legacies and mortgages.

Defendants Nash dealt with Bauman, and paid him for the title which failed.  He gave them a warranty deed, and their recourse is against him upon his warranty.

Having obtained jurisdiction over this estate on well-recognized equitable grounds, it is within the power of the chancery court to retain jurisdiction, fully administer and wind up the same.  We think this should be done with all convenient speed.

The decree of the lower court must be reversed and a decree may be entered herein in accordance with the foregoing conclusions, remanding the case to the circuit court of Ottawa county in chancery, with authority to appoint a receiver, take possession of the property of said estate, and sell the same, pay the debts of said estate (in determining the exact amount of which under the rules above intimated further testimony may be heard), award contribution and distribution between beneficiaries, and take such other and further proceedings as may be found necessary in order to fully administer and close said estate. Costs of this appeal are awarded in favor of appellants against Stroh and Bauman.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.