POOLE *v.* UNION TRUST CO.

1. WILLS—ANNUITY—RESIDUARY LEGACY—ESTATES OF DECEDENTS.
   Where the last will of a testatrix provided for an annuity
   of $10,000 to her husband and for a residuary legacy of half
   the remaining estate to her son, and the other half to be
   held in trust for the benefit of her daughter, with power
   to control and sell, and to reinvest the proceeds, the in-
   come derived from the trust fund to be paid to said
   daughter, and it appeared that the husband renounced the
   provision so made for him and elected under the laws of
   a foreign State to take a third share in the real property
   of decedent, and there was more than enough cash to pay
   the debts and expenses of administration without affecting
   the income of the trust estate, the daughter was entitled,
   as against the remaindermen, to one-half of the entire
   royalties under mining leases forming a part of the resid-
   uary estate, and which should be treated as income rather
   than a part of the corpus of the estate, in order to carry
   out the apparent intent of the testator to treat daughter
   and son equally.

2. SAME—LIFE TENANT—MINES.
   Where mines have been opened or leases executed before
   the life estate commenced, the owner of the life interest
   may, in the absence of restraining words, work the mines
   even to the point of exhaustion, and take the profits.

3. SAME—TIME OF COMMENCEMENT—CONSTRUCTION.
   The income of royalties was payable immediately after the
   death of the testatrix and was not determinable from
   the date of delivering the trust estate to the executors as
   trustees. The royalties which were earned previous to
   and payable after testatrix's death were also due to the
   beneficiary in the trust.

4. SAME—STOCK DIVIDENDS.
   As a rule, cash dividends, however large, are regarded as
   income, stock dividends as capital: and therefore stock

dividends received by the trustees as part of the estate, and representing increases in the value of corporate assets, belonged to the corpus of the estate.

5. SAME—TIMBER RIGHTS—GENERAL RULE.

Usually the life tenant is allowed to cut timber for the purpose of clearing the land, provided the part cleared, with what is under cultivation does not, as compared with the remainder of the tract, exceed the proportion of cleared to wooded land allowed by good husbandry; and provided, further, that the value of the inheritance is not thereby materially lessened. The right to the proceeds followed complainant's right to cut the timber.

6. SAME—TAXES—EXPENSE OF TRUST.

Taxes were chargeable to the remainderman where the property was unproductive, and as to unproductive timber lands, the charge of preserving and maintaining this portion of the estate rightly belonged to the estate, not the daughter.

Appeal from Wayne; Hally, J. Submitted January 4, 1916. (Docket No. 13.) Decided March 31, 1916.

Bill by Caroline Boeing Poole against the Union Trust Company, Frank W. Blair, and Hobart B. Hoyt,. trustees under the will of Marie M. Owsley, deceased,. and another, for a decree construing the will of said deceased, for an accounting, and for other relief. From the decree of the court both parties appeal. Modified and affirmed.

*Beaumont, Smith & Harris,* for complainant.

*W. W. Gurley* and *Howard M. Carter,* for defendants.

KUHN, J. The testatrix inherited from her first husband, William Boeing, and a deceased daughter, one-half the former's estate. (Her surviving daughter, the complainant herein, inherited one-quarter, and her surviving son, a defendant, the other one-quarter interest.) She devised to her surviving children, in

equal parts, the residue of her one-half interest, after making certain specific legacies and devises, one of which included an annuity of $10,000 to her second husband, Dr. Owsley. That part of the will, the effect of which is in doubt, reads as follows:

"8th. All of the rest and residue of my estate, real and personal, whatever it may be, and wherever located, I direct shall be divided into two equal parts, one of which I hereby give, devise, and bequeath to my son, William E. Boeing, in absolute and unqualified fee simple. The other half of said residue, or residuum, I hereby give, devise, and bequeath to my executors hereinafter named, in trust, for the sole and separate use and benefit of my daughter, Caroline M. Boeing. My said executors shall have full power and control of said trust property; they may sell and convey it in whole or in part by their deed or deeds, without the union of my said daughter, and the entire property shall be altogether free from any marital right or other right on the part of any husband my said daughter may have; said trustees may sell any securities held by them as a part of the trust fund and make transfer of the same; they may reinvest proceeds of sale, or invest original money; in short, they shall have full, sole, and complete authority over and control of said fund or property, and no purchaser from them shall be bound to see to the application of the purchase money. But said trustees must zealously preserve and carefully hold the corpus or principal of said fund, whatever its form, subject to the trust created for it by this will, to be ultimately disposed of as directed below, with this one and sole proviso, that if it be necessary, as suggested in the third clause of this will, to contribute anything from this trust fund to maintain the fund intended to provide an income for my said husband, then the trustees holding my daughter's trust fund shall make such contribution as may be the proper share of my daughter to such deficiency, and they are accordingly hereby empowered to do so in that event. The income arising from this fund or property, the said trustees shall pay over to my said daughter, Caroline M. Boeing, semi-annually or quarterly, or

oftener, as may be the most convenient, as her sole and separate estate, free from the debts, control, or marital rights of any husband she may have. And this shall continue during the life of my said daughter. At her death the entire trust fund created for her by this will shall pass in fee simple to such child or children of hers as may survive their mother, and the descendants of any child or children of hers who may be dead, leaving child or children, descendants in any case to take per stirpes, and not per capita. But my said daughter may by her last will and testament dispose of said trust fund as she may see fit in the event that she dies leaving no child or children, or the descendants of any, and her said brother dies before she does, leaving no child or children, or the descendants of any. At the death of my said daughter leaving no child or children, or the descendants of any, the entire trust fund shall pass in fee simple to my said son, William E. Boeing, or, he being dead, to his child or children surviving him and the descendants of any who may be dead, descendants to take per stirpes and not per capita."

The estate of Mrs. Owsley included $151,823.72 cash; securities aggregating $485,775, par value; bills and accounts receivable amounting to $335,548.53; farm stock worth $5,421.14; an undivided share in the first husband's undivided interest in unproductive timber lands (the children owning the other shares); and an undivided share in the first husband's undivided one-sixth interest in mineral lands in Minnesota. These lands were under lease for mining operations, and the royalties accruing had been paid to Mrs. Owsley and the two children in shares of one-half to the former and one-fourth to each of the latter.

Dr. Owsley, having renounced the provisions in the will made in his behalf by Mrs. Owsley, took under the laws of Minnesota, as surviving husband, an undivided one-third of his wife's real estate. The residue devised to the children was thus reduced to two-thirds.

The will was probated, and the executors and trust-

ees, after paying debts and expenses of administration, divided the real and personal assets, delivering one-half to the son and one-half to themselves as trustees for the daughter's share. They then. filed a bill in the chancery court asking for an allowance of their account and a discharge. There was more than enough cash belonging to decedent's estate to pay debts and expenses, without resorting to the income belonging to the trust fund.

On December 30, 1914, the court entered a decree allowing the account, discharging the executors and trustees, and appointing the defendants Union Trust Company, Frank. W. Blair, and Hobart B. Hoyt as new trustees to carry out the provisions of the will. In its decree the court reserved certain questions which had been raised in the bill of the executors as to the division of assets and expenses between the life estate and the remainder interest in the share left in trust. The present bill was filed for a construction of the will and instructions to the trustees on these doubtful points. The questions are:

(1) Are the royalties arising from the mining leases a part of the income payable to the complainant as life tenant?

(2) Did the income payable to complainant begin to run immediately after Mrs. Owsley's death, or at the time the trust estate was delivered by the executors to themselves as trustees?

(3) Were the royalties which were earned previous to, but payable after, Mrs. Owsley's death a part of the general assets of the estate, or payable to the complainant as life tenant?

(4) Is the complainant entitled to the additional stock received by the trustees in the nature of a stock dividend?

(5) Are the taxes and expenses of carrying unproductive trust lands payable out of the remainder or out of the complainant's income?

(6) Do the proceeds of the sale of timber belong to the life tenant, or are they a part of the remainder?

The court below found in favor of the complainant in answer to questions 1, 2, 3, and 6, and against her in answer to questions 4 and 5. A decree was entered accordingly, from which both parties have appealed.

The questions involved will be discussed in the order presented above.

(1) Are the royalties arising from the mining leases a part of the income payable to the complainant as life tenant?

Under these leases the lessees agreed to pay the lessors a royalty of 25 cents a ton quarterly for all ore mined and shipped. An annual minimum royalty, designated as "ground rent," was provided for. Lessees were to pay all taxes and assessments against the land during the lives of the leases. All the leases had been executed by the testatrix and the other owners of the fee at least five years before the death of the testatrix.

By the later common law, life estates, whether conventional or arising by operation of law, were impeachable for waste, unless the instrument creating a conventional life estate expressed a contrary intention. Under this rule, a life tenant was not permitted to open new mines. *Plymouth* v. *Archer*, 1 Bro. Ch. Rep. 159; *Viner* v. *Vaughan*, 2 Beav. 466; *University* v. *Tucker*, 31 W. Va. 621 (8 S. E. 410) ; *Marshall* v. *Mellon*, 179 Pa. 371 (36 Atl. 201, 35 L. R. A. 816, 57 Am. St. Rep. 601) ; *Ohio Oil Co.* v. *Daughetee*, 240 Ill. 361 (88 N. E. 818, 36 L. R. A. [N. S.] 1108, and note) ; also note in 36 L. R. A. (N. S.) 1099. This court refused to follow the common-law rule in the case of *Seager* v. *McCabe*, 92 Mich. 186 (52 N. W. 299, 16 L. R. A. 247), where the remainderman opened the mine, or made the lease. There the life tenant by dower right was permitted to share in the royalties, the court holding that the strict common-law rule was not in harmony with the spirit of our institutions and the policy of our law, and

would often result in defeating the purposes of our dower statute.

It has, however, long been the law that where mines were opened or the leases executed before the life estate commenced, the owner of the life estate might, in the absence of restraining words, work the mines, even to the point of exhaustion, and take the profits. *Campbell* v. *Wardlaw*, L. R. 8 App. Cas. 641; *Reed* v. *Reed*, 16 N. J. Eq. 248; *Waldorf* v. *Railroad Co.*, 13 Ind. App. 134 (41 N. E. 396); *McFadden's Estate*, 224 Pa. 443 (73 Atl. 927); *Williamson* v. *Jones*, 43 W. Va. 562 (27 S. E. 411, 38 L. R. A. 694, 64 Am. St. Rep. 891); *Boeing* v. *Owsley*, 122 Minn. 190 (142 N. W. 129), and notes in 36 L. R. A. (N. S.) 1099, 1108.

In *Palms* v. *Palms*, 68 Mich. 355 (36 N. W. 419), where this court held that mining royalties should be treated as capital, not income, the testator, after having directed in the will that the net income of his estate should go to his two children during their lives, the principal to their children, made a codicil directing:

"That the royalties and other moneys received from leases of mineral lands, whether such leases be made by me during my life, or by my executors and trustees after my death, shall be considered as a portion of the capital of my estate, and shall be invested as such by my executors and trustees. The income derived from such capital to be paid to my children as in my will provided."

Fourteen days before he died, he had leased for mining purposes the iron ore on 160 acres, for 20 years. Justice MORSE, in his opinion, regarded this as a sale of the ore, or part of the land, citing decisions of the Pennsylvania court in which similar transactions were held to have that effect.

An examination of these cases, however, indicates that in none of them was the question of the right to

the royalties, as between life tenant and remainderman, involved. In *Stoughton's Appeal*, 88 Pa. 198, a guardian, though having generally the power to lease the ward's property, was not allowed to make a lease of oil without court authority, the effect being a sale of the oil. In *Scranton* v. *Phillips*, 94 Pa. 15, the lessees of coal for such a period as would be required to remove it all, were entitled to the benefit of a release of liability for injury to the surface given the lessor owner by the grantee of the surface, it being virtually a sale of the coal. In *Sanderson* v. *City of Scranton*, 105 Pa. 469, and *Delaware, etc., R. Co.* v. *Sanderson*, 109 Pa. 583 (1 Atl. 394, 58 Am. Rep. 743), the question as to who was liable to pay taxes on coal in mine was determined by the effect given the lease as a sale of the coal. The same effect was given a lease in *Hope's Appeal* (Pa.), 3 Atl. 23. And in *Fairchild* v. *Fairchild* (Pa.), 9 Atl. 255, a lease was made of mineral lands. After the death of the lessor, the lands descended to his children. One of the daughters died, and her husband claimed the royalties as rents, because of his being a tenant by curtesy in the real estate. They were, however, held to be personalty, distributable according to the intestate laws.

These cases seem inconsistent in reasoning with the later decisions of the Pennsylvania court, which are found to be in agreement with the great weight of authority, in holding that the working of open mines by the life tenant is not waste, and that the profits of the mines belong to the life estate. In *Neel* v. *Neel*, 19 Pa. 323, it was said:

"The most obvious inference would seem to be that when a man devises land with an open mine upon it, to a person for life, he intended the devisee to derive profit from the mine, as well as from the surface of the land."

See, also, *Shoemaker's Appeal*, 106 Pa. 392, in which *Stoughton's Appeal* and *Scranton* v. *Phillips, supra,* were cited and disregarded by the court; *McFadden's Estate*, 224 Pa. 443 (73 Atl. 927), and the cases digested in Barringer & Adams on the Law of Mines and Mining in the United States, vol. 1, p. 8, and volume 2, p. 3.

A study of the cases indicates that the courts look closely to discover and give effect to the intention of the testator. In *Palms* v. *Palms, supra,* the testator gave clear instructions in the codicil how his will should be construed as to the disposition of mining royalties, and the court could not have done otherwise than treat them as capital, belonging to the corpus of the estate. On the other hand, it is reasonable to suppose that this testatrix, who had been enjoying a considerable income from her mining interests, and sought by her will to divide equally the enjoyment of her estate between her two children, intended and expected that each was to receive one-half the income from these interests, not that the son should receive all the proceeds from the mines, the daughter to receive only the interest these proceeds might earn. The intention on the part of the testatrix to distribute the estate equally between her son and daughter can be readily obtained from the will. She refers to the fact that the property which she is about to distribute came to her from the father of her two children, and states that she wishes the property which the father had accumulated by his labor and foresight to be enjoyed by her children. There is no evidence in the will that the testatrix meant or intended that the daughter's enjoyment of the property should be any less than the son's. A reading of the whole will is convincing that it was her disposition to treat the son and daughter alike as to the benefits to be derived under the will, and it is clear that this theory of an equal division of the estate is interfered

with unless one-half of the entire net royalties under the mining leases are given to the daughter. It is also apparent on this record that the testatrix, during her lifetime, treated the royalties from the mines as part of her regular income, and in the consideration of them they were no different to her than the moneys she received as dividends upon the stock which she owned. We are therefore of the opinion that the court below was correct in holding that the mining royalties under the circumstances of this case should be considered as income, rather than as part of the corpus of the estate.

(2) Did the income payable to complainant begin to run immediately after Mrs. Owsley's death, or at the time the trust estate was delivered by the executors to themselves as trustees?

The lower court held that the income was payable immediately after the death of the testatrix, and the defendants' counsel conceded this to be correct. Inasmuch as the personal assets left by the testatrix exceeded her debts and the expenses of administration, the income is not liable to a charge for this purpose, and should go intact to the one entitled to it under the will. *Lovering* v. *Minot,* 9 Cush. (Mass.) 151. We affirm the ruling of the lower court on this point.

(3) Were the royalties which were earned previous to, but payable after, Mrs. Owsley's death a part of the general assets of the estate, or payable to the complainant as life tenant?

The lower court held that these payments were unapportionable, citing *Dexter* v. *Phillips,* 121 Mass. 178 (23 Am. Rep. 261). Counsel do not dispute the holding, and we think it is correct. These royalties should go to the complainant, the same as if they were periodical payments of rent.

(4) Is the complainant entitled to the additional

stock received by the trustees in the nature of a stock dividend?

The following appears in the record as a part of the testimony of Harold W. Burdon, an accountant, who was employed as an auditor in connection with the estate in September, 1911, and who professed familiarity with all the financial transactions of the estate before and after that time:

"Among the stocks that were held by Mrs. Owsley in her lifetime and turned over by her executors to the trustees, there were some stocks of the Griffin Wheel Company and of the Ajax Forge Company. The Ajax Forge Company was an Illinois corporation, as was also the Griffin Wheel Company. Some time in April, 1913, the Griffin Wheel Company was reorganized and reincorporated under the laws of Massachusetts, and the Massachusetts corporation acquired all of the assets of the Illinois corporation. I could not say whether there were any additional assets put in. I do not know whether or not there were any assets that were not a part of the original assets of the Griffin Wheel Company, the Illinois corporation.

"The Ajax Forge Company was reorganized in October, 1913. It was reorganized under the laws of Delaware and took over all of the assets of the Illinois corporation.

"As a result of the reorganization of the Griffin Wheel Company, there was additional stock paid over to the trustees. I have a memorandum here of additional stock. I think roughly it was about $83,000. There was preferred stock of $11,210.00 ($11,250.00, 112½ shares), and common stock of $11,200.00 (112 shares), at par, both of them. That was in the Griffin Wheel Company.

"There was additional stock went to the trustees in the reorganization of the Ajax Forge Company. The preferred stock, issued in addition to their previous holding, was $38,050.00 (380½ shares), and common stock $25,000.00 (250 shares), both at par. All this additional stock is now held by the present trustees."

It also appears from Exhibit 39 that the trustees made investments, among others, as follows:

| | | |
|---|---|---:|
| May 18, 1911. | 200 shares Griffin Wheel Co., Pref. ..................... | $20,000 |
| June 17, 1912. | 25 shares Griffin Wheel Co., Com. ..................... | 5,000 |
| Sept. 5, 1913. | 64½ shares Ajax Forge Co., Pref. ..................... | 6,450 |
| | | $31,450 |

Witness Burdon testified that as to moneys received by the executors, no effort was made in keeping the accounts to differentiate between what was strictly income and what was a part of the remainder or corpus of the estate. All the funds of the executors received from all sources were commingled, and expenses of administration, etc., were paid out of the general fund into which all the assets were thrown.

H. S. Rooksby, who was familiar with the stock transactions which resulted in these stock dividends, testified that he had made an effort to ascertain when the "profits" out of which the additional stock arose were earned. He had examined the companies' accounts, but the apparent assets were practically the same at the end of the fiscal year 1910 and just prior to the reorganization in 1913. All the extensions that had been made, the properties that had been built, the plant, machinery, and things like that, had been taken up and depreciated. The net result of this course of action was that all these increases of plant, buildings, etc., had apparently not increased their assets.

"In other words, they took these profits and they put them into buildings and machinery. Subsequently they depreciated the buildings and machinery, the value of it, properly, so that these increases disappeared."

It was not possible to determine from the books whether these profits were earned before or after Mrs. Owsley's death. It would require a very minute and extended examination to find out what the plant, ma-

chinery, equipment, etc., cost, and an appraisal at the time of the reorganization. The witness concluded:

"This was not strictly a stock dividend. The stockholders got this additional stock, by resolution of the board of directors, and by resolution of the shareholders they agreed to reorganize and issue this stock, as I have stated, in this proportion. In other words, they organized new corporations and turned over the old assets, or the assets of the old corporations to the new corporations; and they issued more stock for the assets in the new corporation than was outstanding in the old corporation."

There is no indication in the will of the intention of the testatrix in regard to the disposition of such an increase in the trust fund. Indeed, it is likely that the testatrix did not contemplate such an event. This being the case, resort must be made to the rules of law which have been laid down to govern such a contingency.

The courts in this country have not been able to agree on a rule for the division between life tenant and remainderman of unusual and extraordinary distributions, in the form of stock or cash, made from earnings, though the majority favor, and the tendency is toward, the Pennsylvania rule, which apportions them according as they were earned before or after the commencement of the life estate, rather than the Massachusetts rule, which is thus stated in *Minot* v. *Paine*, 99 Mass. 101, 108 (96 Am. Dec. 705):

"A simple rule is, to regard cash dividends, however large, as income, and stock dividends, however made, as capital."

They do seem, however, to be agreed on the principle that such distributions belong to the corpus of the estate, not the income, when they represent a reduction of capital, or a change of its form, or an enhancement of the value of the capital assets from causes other than the accumulation of earnings. *Kalbach* v.

*Clark,* 133 Iowa, 215 (110 N. W. 599, 12 L. R. A. [N.
S.] 801, 12 Am. & Eng. Ann. Cas. 647) ; *Miller* v.
*Payne,* 150 Wis. 354 (136 N. W. 811) ; *Thayer* v. *Burr,*
201 N. Y. 155 (94 N. E. 604), approved in *Re Osborne,*
209 N. Y. 450 (103 N. E. 723, 823, 50 L. R. A. [N. S.]
510, Am. & Eng. Ann. Cas. 1915A, 298) ; *Ex Parte
Humbird,* 114 Md. 627 (80 Atl. 209) ; 5 Thompson on
Corporations (2d Ed.), § 5414; *Holbrook* v. *Holbrook,*
74 N. H. 201 (66 Atl. 124, 12 L. R. A. [N. S.] 768, and
note) ; and note in 35 L. R. A. (N. S.) 563. And this
principle is not intrenched upon by those decisions
(*e. g., Bryan* v. *Aiken* [Del.], 86 Atl. 674; *Boyer's
Appeal,* 224 Pa. 144 [73 Atl. 320] ; *Smith* v. *Dana,* 77
Conn. 543 [60 Atl. 117, 69 L. R. A. 76, 107 Am. St.
Rep. 51]), which give to the life tenant stock dividends
which represent accumulations of earnings invested in
improvements or extensions. Such decisions view the
distribution as one of earnings essentially, though their
form has been changed by the corporation. What are
the elements in this case which tend to reveal the true
character of these distributions?

Some of the stock in each company came to the ex-
ecutors as part of the trust fund or corpus. Some of
it was purchased by the trustees. But since the trust-
ees commingled the income and principal assets and
kept no accounts to differentiate them, it cannot be
known whether the purchase was made from assets
belonging to the life estate or from principal assets,
or from both. It may be suggested that since the
trustees were directed by the will to pay all the income
to the complainant, but were given full power and con-
trol of the trust fund, with authority to sell any se-
curities held by them as part of the trust fund, and
reinvest the proceeds of the sale, or invest original
money, and indeed were authorized to sell and convey
the whole property, without the union of the complain-
ant, it is more likely that in their uncertainty as to the

disposition that should be made of the income of the trust estate they invested the $31,450 in these securities as principal, intending to use or assuming to use original money or some other part of the fund which they regarded as principal assets; for they clearly had no authority to invest the income.

Assuming, then, that this was an investment of principal assets, we still have to determine the original question: Is this essentially a distribution from earnings? It is clear from Rooksby's testimony that there were no accumulated earnings at any time, no "fund" out of which this additional stock was declared indirectly or directly. Instead of allowing earnings to accumulate, the corporations used them, according to the principles of good business management, in increasing and maintaining equipment. That is, there were only enough earnings to take care of the natural growth of the business, and offset depreciation, not enough to meet these needs and develop besides a surplus of accumulated earnings. The situation does not even seem to come within those cases where it has been held that a surplus turned into equipment and new property is still essentially earnings, and that a stock dividend representing increase in value of such equipment and extension is income belonging to the life tenant. For the witness says that the apparent assets were practically the same at the end of the fiscal year 1910, when the testatrix died, as they were just prior to the reorganization in 1913, and there was no evidence that the reorganization was accompanied by the addition of new assets. The testimony of this witness, reviewed above, all seems to point to the conclusion that the assets had not been increased. "In other words," he said, "they took these profits and they put them into buildings and machinery. Subsequently they depreciated the buildings and machinery, the value of it; properly, so that these increases disappeared"; and concludes that "this

was not strictly a stock dividend." So that, instead of representing transmuted earnings, these stock distributions, according to the only evidence in the record, seem to represent merely an enhancement in value of the corporate assets, from causes other than the accumulation of earnings, apparently due to good management and the growth of trade. In view of this conclusion, we are not concerned with the inquiry whether these so-called "profits" were earned before or after Mrs. Owsley's death.

The trial judge was therefore correct in holding that under the showing made in this record the stock dividends should be considered as part of the corpus of the estate, rather than as income.

(5) (6) Are the taxes and expenses of carrying unproductive trust lands payable out of the remainder, or out of complainant's income?

The lower court very properly allowed his decision of this question to be influenced largely by his decision of the last question: Do the proceeds of the sale of timber belong to the life tenant, or are they a part of the remainder?

These he awarded to the life tenant, upon the supposed authority of *Delaney* v. *Manshum,* 146 Mich. 525 (109 N. W. 1051), regarding the decision of this court in *Stroh* v. *O'Hearn,* 176 Mich. 164 (142 N. W. 865), as not in point. In the former case, the widow was suing to establish her dower right in the timber on 40 acres of land owned by her husband, which timber the husband had sold to the defendants by a cutting contract to which the complainant's signature was not secured. The court held defendants could not cut the timber after the husband's death, since the trees were a part of the realty, to which the wife's right of dower attached in spite of the contract. But the court was not called upon to decide the extent of that right in

191 Mich.—12.

the land, nor how the widow might use the property under her right of dower. In *Stroh* v. *O'Hearn*, on the other hand, the court expressly stated that, as to the owners of a life estate in land, "their timber deed to Stroh authorized waste of the fee, and was invalid," thus holding, in effect, that life tenants are not entitled to the proceeds of timber sales, and could not sell the timber in the first place.

By the common law, the life tenant was narrowly restricted in the taking of timber to estovers of fuel and repairs, save where, as hereafter noted, the custom of the estate was otherwise. In America, because of the abundance of wooded land and the comparative scarcity of arable land, the common-law rules were relaxed, and it has been the general rule to allow the life tenant to cut timber for the purpose of clearing the land, provided the part cleared, with that under cultivation, does not, as compared with the remainder of the tract, exceed the proportion of cleared to wooded land allowed by good husbandry; and provided, further, that the value of the inheritance is not thereby materially lessened. The latter consideration is the great criterion. *Rutherford* v. *Wilson*, 95 Ark. 246 (129 S. W. 534, 37 L. R. A. [N. S.] 763, and note) ; *Hill* v. *Ground*, 114 Mo. App. 80 (89 S. W. 343) ; *Dorsey* v. *Moore*, 100 N. C. 41 (6 S. E. 270) ; *Keeler* v. *Eastman*, 11 Vt. 293; *Norris* v. *Laws*, 150 N. C. 599 (64 S. E. 499) ; *Proffitt* v. *Henderson*, 29 Mo. 325; *Disher* v. *Disher*, 45 Neb. 100 (63 N. W. 368) ; *Drake* v. *Wigle*, 24 U. C. C. P. (Canada) 405; *Saunders* v. *Breakie*, 5 Ont. Rep. 603; *Warren County* v. *Gans*, 80 Miss. 76 (31 South. 539) ; *Learned* v. *Ogden*, 80 Miss. 769 (32 South. 278, 92 Am. St. Rep. 621) ; *Davis* v. *Gilliam*, 40 N. C. 308, 311; *Wilkinson* v. *Wilkinson*, 59 Wis. 557 (18 N. W. 527). And the right to the proceeds of sales obviously follows the right to cut the timber, as was observed in some of these cases.

Where, before the commencement of the life estate, the land has been cultivated for the produce of salable timber, the life tenant may continue the cultivation for his own profit. This is so even in England, where the law is strictest in favor of the owner of the inheritance, the right being analogous to the right of the life tenant to work mines that were being operated at the commencement of his estate. *Honywood* v. *Honywood,* L. R. 18 Eq. 306. And see *Williard* v. *Williard,* 56 Pa. 119. But the meager facts in this record indicate that there had been no lumbering business on these lands at any time, and whatever sales were made by the testatrix were not made in the course of a regular business of selling timber, but were irregular, unconnected sales of "tracts" of timber or "undivided interests." Moreover, it is significant that these lands were purchased for investment and resale. Such evidence points to the conclusion that these were sales of real estate, sales of parts of the corpus of the estate, the proceeds of which should be preserved as principal. Such property as this the trustees are authorized to sell and reinvest the proceeds of. They are authorized by the will to pay only the income of such property or the income from the proceeds of its resale, to the daughter. Since it appears that the property is valuable principally for the timber standing on it, it follows that the inheritance would be very greatly damaged if the trustees should sell the timber off the land and pay the proceeds to the life tenant. The life tenant will not be allowed to so use the land as to materially injure the fee. *Duncombe* v. *Felt,* 81 Mich. 332 (45 N. W. 1004) ; *Heliker* v. *Heliker,* 184 Mich. 657 (151 N. W. 757). The lower court was therefore in error on this point.

As to the responsibility for taxes, the circuit judge held they were chargeable to the life tenant, on the strength of certain decisions of this court, and as a

matter of equity. Since the remainderman had been deprived of the only thing of appreciable value on the timber land, it was thought that he should not be required to bear the expenses of the property. This consideration has, of course, been eliminated by the conclusion as to the ownership of the proceeds of the timber sales. The decisions cited state the general rule that the life tenant should pay taxes during the continuance of his estate. *Jenks v. Horton*, 96 Mich. 13 (55 N. W. 372); *Watkins v. Green*, 101 Mich. 493 (60 N. W. 44); *Defreese v. Lake*, 109 Mich. 415 (67 N. W. 505, 32 L. R. A. 744, 63 Am. St. Rep. 584). It has been held in several cases, however, that where the property is unproductive, the burden of taxation should be borne by the remainderman, rather than by the life tenant. *Crockett v. Crockett*, 2 Ohio St. 180; *Stone v. Littlefield*, 151 Mass. 485 (24 N. E. 592); *Clark v. Middlesworth*, 82 Ind. 240; *In re Martens' Estate*, 16 Misc. Rep. 245 (39 N. Y. Supp. 189). It seems but just that the burden and expense of preserving the inheritance in the unproductive timber lands to the remainderman should be borne by the principal, not the income. Such an exception to the general rule placing the tax burden on the life estate is supported by good reason and the authority cited.

With the modifications herein suggested, the decree of the court below is affirmed.

STONE, C. J., and OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred.