PARKS *v*. SHERMAN.

1. MORTGAGES—TRUST DEED AS SECURITY FOR LOAN NEVER MADE—
   VALIDITY.
   Where a trust deed was executed as security for a loan at
   a bank, and the bank refused the loan, the deed never
   took effect, and its assignment by the trustee was with-
   out consideration.

2. SUBROGATION—NOT AVAILABLE TO VOLUNTEER.
   A principle which lies at the bottom of the doctrine of sub-
   rogation is that the person seeking it must have paid
   the debt under grave necessity to save himself a loss;
   the right never being accorded to a volunteer.

3. SAME—VOLUNTEER.
   Where plaintiff volunteered to pay the debt of a lodge to
   relieve a member who was holden therefor, expecting that
   a note signed by several members and secured by a trust
   deed given by defendant would be accepted by the bank
   next day, and the money repaid him, but the bank refused
   to make the loan and the money was never repaid, *held*,
   that plaintiff had no right of subrogation to the trust
   deed, since neither plaintiff nor defendant were under
   obligation to pay the debt, and plaintiff was merely a
   volunteer.

4. FRAUDS, STATUTE OF—ORAL PROMISE TO PAY DEBT OF ANOTHER.
   An oral promise by defendant to plaintiff, made some time
   afterwards, to reimburse him for money voluntarily paid
   for the debt of another, *held*, without consideration and
   void.

5. SUBROGATION—LEGAL AND EQUITABLE RIGHTS OF OTHERS.
   Since equity follows the law, the equitable doctrine of sub-
   rogation must be applied with due regard to both the
   legal and equitable rights of others.

Appeal from Berrien; White (Charles E.), J. Sub-
mitted October 17, 1919. (Docket No. 65.) Decided
February 27, 1920.

Bill by William T. Parks against Arthur Sherman for subrogation to rights under a trust deed. From a decree for plaintiff, defendant appeals. Reversed, and bill dismissed.

*Cady & Andrews,* for plaintiff.

*O'Hara & O'Hara,* for defendant.

STEERE, J. This litigation had its origin in the financial delinquences of a fraternal organization which at one time existed in the city of Benton Harbor known as the "Loyal Order of Moose, Lodge No. 879," which went out of existence with its debts unpaid some time prior to the commencement of this suit. Amongst its former active members were plaintiff Parks, defendant Sherman, Charles K. Farmer, A. J. Glennan, H. U. Rapp, and W. E. Marsh who was cashier of the Farmers & Merchants' National Bank of Benton Harbor. Marsh had upon his own responsibility, without submitting the application to the loan committee of his bank, lent the lodge money from the bank's funds. A loan of $1,000 which he made to the lodge on June 15, 1915, was not paid when due. It was evidenced by two notes of that date to the bank for $500 each due in six months with interest at 7%, signed by Charles K. Farmer and A. J. Glennan as a board of trustees of said lodge. When they fell due, on December 15, 1915, the lodge defaulted in payment. The officers of the bank notified Marsh that if this unauthorized loan made by him was not paid by December 31, 1915, the amount would be charged up to him and he would be held personally responsible for the same. He was not in financial condition to care for the notes as demanded by the bank and appealed to fellow-members of the lodge to help him out. Farmer, who as a trustee of the lodge had signed the note, called several meetings of certain members of

the order for the purpose of devising some means of taking care of the paper. Plaintiff attended five of them and defendant two or more. Negotiations were had with the cashier of another bank in Benton Harbor for a loan of $1,000 with which to pay the past due notes which Marsh's bank held him responsible for. The following note which they supposed would be accepted was prepared and signed for that purpose:

"$1,000.

"BENTON HARBOR, MICHIGAN, December 31, 1915.

"Sixty days after date, I promise to pay to the order of Benton Harbor State Bank $1,000 (one thousand and no/100 dollars) at Benton Harbor State Bank. Value received. With interest at 7% per annum.

"CHARLES K. FARMER,
"W. T. PARKS,
"W. E. MARSH,
"A. J. GLENNAN,
"H. U. RAPP,
"ARTHUR SHERMAN."

Endorsed on back:

"Protest waived. Loyal Order of Moose Lodge No. 879. Charles K. Farmer, A. J. Glennan, trustees."

The cashier of the Benton Harbor State Bank had, on December 31, assured members of the lodge who made application for the loan that they could borrow the money on this note, but with the qualification that their application had to be taken up by him with the loan committee of the bank at its meeting after closing hours that afternoon. The loan committee, however, disapproved the loan and refused to accept the note. Plaintiff was with Marsh and others in Farmer's office on December 31st, when it was expected the new loan would be consummated, and testified that some members, he did not recall who, went down with the note to the Benton Harbor State Bank to get the money for the purpose of taking it over to the National Bank of which Marsh was cashier, and there

paying the $1,000 evidenced by the past due lodge notes which he had accepted without authority; that "when they came back they informed Mr. Marsh and the rest of us they could not get the money until the next day at five o'clock"; and "Mr. Marsh almost fainted in his chair there," saying "that money has got to be taken up before 4 o'clock." Plaintiff thereupon, without solicitation of any one so far as shown, went to the National Bank that afternoon and paid up the past due notes over which the trouble had arisen. Of his reason for so doing he says, after telling of Marsh's manifestations of distress:

"That is what gave me the motive for going and taking it up myself, to relieve the strain on Marsh's mind at that time. * * * I took some securities I had, borrowed a thousand dollars and went to the bank and took up the notes under a promise of getting the money from the other bank the next day. That is the reason I paid the notes."

Who then made that promise plaintiff does not disclose. It concededly was not defendant, who was not present and knew nothing of the refusal of the State Bank to approve the loan and accept their note until some time later.

On the date of this rejected note defendant Sherman and his wife executed an instrument called a trust deed to H. U. Rapp covering property described as the north 31 feet of lot 2, block F, Webb's addition to the city of Benton Harbor, and a chattel mortgage for $1,000 covering the regalia, furniture and other personal property of Lodge No. 879, Loyal Order of Moose, was given Sherman, signed by Farmer, Glennan and Marsh as "trustees," by what authority is not made plain.

The so-called trust deed to Rapp was destroyed in a fire which burned up his store. Secondary evidence was given of its contents and purpose. Sherman tes-

tified that the property it covered was worth $2,300 upon which there was a mortgage of $1,100; that at a meeting called to discuss ways and means to take care of this past due indebtedness Parks announced the State Bank would take a note signed as proposed with some additional security, and at Marsh's request he executed the deed to Rapp who had given the brethren quite a talk on their moral obligations; that they told him the deed was wanted as additional security by the Benton Harbor State Bank and Farmer asked him to make it out to Rapp, as trustee, and he accordingly made out the deed to Rapp as security, or collateral, for the note they all signed. Rapp testified that he never talked about the matter with Sherman before he signed the note, which he at first refused to sign, but states he did so later, "after Mr. Farmer came to my office with the deed made out to me as trustee. This deed was made by Mr. Sherman, as security for signing the note. * * * It was clearly set forth to me that Mr. Sherman was becoming solely as guarantor for payment of the note to the subscribers, to the signers." Plaintiff's testimony is that it was given to Rapp "as trustee for the persons named, that signed the note."

It eventuated that plaintiff's fraternal faith was not well founded and his impulsive liberality for the good of the order in general and Marsh in particular left him a victim of misplaced confidence. Unable to get his money back either from the lodge or any of those who had signed the unnegotiated note to the State Bank he, on April 11, 1918, secured from Rapp an assignment of the trust deed of December 31, 1915, which Rapp testified was withheld from record at Sherman's request and destroyed by fire some time before he made the assignment. In the meantime the lodge had faded out of existence and Sherman refused to recognize any legal or moral obligation in the mat-

ter beyond an offer to contribute his proportion of the $1,000 in connection with the others who signed the note to the State Bank. Actuated as he admits by plaintiff's insistence that he was holden for the whole $1,000 paid by the former as related, Sherman foolishly deeded the property described in the trust deed to his wife through the medium of a third party, which concededly availed him nothing and so far as of any significance could only serve to his prejudice.

On April 11, 1918, plaintiff filed this bill of complaint, in the nature of a foreclosure bill, to collect the money he had paid the National Bank in taking up the past due note of the lodge, primarily to relieve Marsh as he testified, claiming under the facts alleged that he was subrogated to rights evidenced by the trust deed. The trial court adopted that view and granted the relief asked.

Plaintiff's documentary evidence in this case is the past due notes of the lodge to the National Bank for $1,000 which he voluntarily paid on December 31, 1915, the rejected note to the Benton Harbor State Bank signed by Farmer, Parks, Marsh, Glennan, Rapp, and Sherman, the chattel mortgage from the lodge to Sherman with an affidavit by the latter of its renewal and the assignment to plaintiff by Rapp' of the unrecorded and destroyed trust deed, to which he claims subrogation and the right to foreclose it as a mortgage.

It is undisputed that the note, chattel mortgage and trust deed were prepared and signed with the expectation and for the purpose of borrowing $1,000 from the Benton Harbor State Bank. That project failed, and different arrangements were made, to which Sherman was not a party, and of which he had no knowledge at the time. He, at Marsh's request, had previously prepared, executed and acknowledged the trust deed and given it to Farmer who turned it

over to Rapp who then signed the note. Plaintiff's claim is that when subsequently informed of what had been done Sherman ratified it. This the latter denies, except as he offered to pay his proportion. Of the transaction when plaintiff parted with the money he now seeks to recover from defendant he testified on cross-examination in part as follows:

"*Q.* Well, then, your action, taken on the afternoon of December 31st, 1915, when you raised the thousand dollars and went down to the bank and paid the money, was a voluntary action on your part?

"*A.* Yes, sir.

"*Q.* The defendant was not a party to it?'

"*A.* No, sir. He was not until the next day. I took the matter up with him and he said it didn't make any difference, he would stand good' for it just the same. Next day or day after that.

"*Q.* Several months afterwards?

"*A.* Shortly after. I was pretty badly worried there awhile.

"*Q.* You don't claim that Snerman knew anything about your action before you did it?

"*A.* No, sir, he didn't know before I did it.

"*Q.* You did not consult him?

"*A.* He sanctioned it afterwards; O.K.'d it afterwards.

"*Q.* You did not consult him?

"*A.* No.

"*Q.* He didn't agree you should do it?

"*A.* No.

"*Q.* He had no talk with you nor you with him whatsoever, about your paying, personally, a thousand dollars to the Farmers & Merchants Bank?

"*A.* No."

Of the six members who signed the note only three appeared as witnesses in the case, plaintiff Parks, defendant Sherman, and Rapp. Farmer, Marsh and Glennan, the three leading spirits whose fraternal activities laid the foundation for this trouble, seem to have disappeared and did not testify. Of the pur-

pose of the deed, the three who testified agree that it applied only to the unused note the six signed. Sherman, who prepared and executed it, testified it was given as additional security for the note, meaning that "should all the men who were signers of the note not be collectible, finally it would come to the property," while Rapp testified it was made "as security for signing of the note," and Parks that it was to protect the signers of the note. In 1918, when Parks was pressing Sherman for payment he refused to accept the latter's offer to pay his share, and in explanation states that he said to Sherman, "If you pay me your share and release this deed, I can't get the rest." Adverting to the purpose of the deed as he yet understood it he testified as follows:

"The talks that I had with Sherman were had in 1918, and I asked him at those times what we had better do about it. He had requested us not to record it, consequently we thought nothing more than fair to ask him what we had better do. We thought the proper time had come to record that to protect the signers.

"Q. Protect the signers of what?
"A. Of that note.
"Q. The note that was never used?
"A. Never used.   *   *   *
"Q. How much have those other men paid you that signed this note?
"A. They have not paid anything.
"Q. None of them?
"A. None of them."

Of the chattel mortgage given to Sherman by the trustees of the Moose Lodge to indemnify him in putting up the trust deed, it appears that the property covered by it did not belong to the lodge but to an allied organization called the Moose Club. The authority of the trustees of the lodge to encumber the property of the club for the debts of the lodge was questioned, and so far as any record evidence is pro-

duced their authority to mortgage either lodge or club
property is not shown.   Parks testified they had such
authority and gives the following not altogether lucid
reason:

"Because the property of the lodge belonged to the
club, Moose Club and not Moose Lodge, consequently,
the trustees had power over that at that time, with-
out the sanction of the lodge.   That was thoroughly
discussed at that time, so as to get it correct.   It was
organized as the Moose Club."

Sherman testified: "I found it had been given me
illegally and didn't amount to anything so I didn't
pay any more attention to it at all"; that he never
took possession of the property under the chattel mort-
gage nor sought to foreclose it, and only came into
possession of the property of the club as a member of
the house committee.   Parks testified of this:

"The control of all this loose property was turned
over to Mr. Sherman by a house committee composed
of Mr. Sherman, Harry Smith and myself.   Mr. Sher-
man then assumed management of the club rooms,
directed its operation, appointed its custodian, and
took charge of all the funds received and paid out.
*   *   *   One reason we turned the management of
the Moose Lodge over to Sherman was because no-
body else would take it.   The lodge was going on the
rocks at that time, but that was not the primary
reason."

At just what time the management was turned over
to Sherman by the house committee is not made clear,
but there is evidence that the lodge finally struck the
rocks and went out of existence in the fall of 1917.
In the meantime the personal property remained in use
in the lodge or club rooms as before, except that to-
wards the close some articles were disposed of as need
or opportunity arose.   The first were some chairs and
a pool table sold to a Mr. Newland by authority of
the organization at a time when its quarters were

208—Mich.—45.

moved from the Newland building into another where rent was lower. Before the lodge went out of existence it several times made payments of interest on the $1,000 it owed Parks and as late as April 8, 1917, the custodian of the lodge by direction of Sherman paid him $46.08, which was what they then had in the club treasury. After the lodge was closed Sherman took possession of and sold some of the property in his capacity as house manager as he claimed, keeping account of the proceeds and applying them to the debts of the organization. His story of the closing events is that he received notice from the secretary of the lodge that it had gone out of existence, with directions "to go and get the stock"; that he was also notified by Graham & Morton that there was a month and a half rent due for which he was being held responsible as one of the house committee that made the deal, and in January, 1918, he took possession of the property, which he listed at a valuation of $325, and says:

"I then paid certain bills of the lodge, including rent. I sent Parks a statement of the property sold, the property on hand, the amount of money owing and a check for the money in my possession, the latter being for $38.40; I had deducted the actual cash paid out by me."

Of this Parks testified:

"Sherman offered to settle up with me for what money there was left for the goods that were disposed of. He sent me an itemized statement of the goods, of the goods sold, and a check for $38.40, and notified others that were still owing him for goods, to come and pay me instead of him. He said he was through with it and didn't have anything more to do with it. I sent the check back. He had taken something out of the amount collected for the sale of the furniture for rent paid by him for the lodge."

To what extent Sherman's activities as house man-

ager expedited the lodge's progress towards the rocks may be open to debate, but in considering the equities which plaintiff's counsel emphasize in connection with his claims of subrogation we do not think it made manifest that Sherman availed himself of or personally profited from the chattel mortgage, which he believed was of no validity.

We think it is fairly shown, though not admitted, that at one of the meetings called by Farmer to consider ways and means of relieving Marsh from the jeopardy which confronted him, Sherman expressed himself fervently in favor of aiding Marsh, to whom he felt under obligation for money lent him in time of need, and offered to put up a deed of property having an equity of a thousand dollars to secure the rest in signing a note to the State Bank for that amount. Like several of the other brethren who did even less he seems to have been generous with lip service, but what he actually did was to join in signing a note to the State Bank prepared for that purpose and give the trust deed to Rapp as related. The fact that the bank refused the note lends color to his claim that they wanted and he gave the trust deed as additional security to the bank, but whether it was to secure the bank or the signers of the note is of little moment, for the bank lent the lodge no money and the note was never used. The contemplated debt to the bank for which the note was to be given, secured as to either signers or payee by the trust deed, was never created. This deed in the nature of a mortgage could only take effect as such when the debt to be secured by it was created as a binding contract to pay. When the contemplated loan failed the proposed security for it went into the discard with the failure. Rapp's assignment of the trust deed to Parks was without consideration, and there was no debt to the bank or contingent liability to him or his co-signers of the unused

note in security for which it was given, as the undisputed testimony shows.

There manifestly were no contract relations to convert this trust deed into legal security for plaintiff's voluntary payment of the lodge's debt—a transaction in relation to which Sherman was not consulted, and of which it is conceded he had no knowledge or notice until some time after the event—but plaintiff's counsel also urge on equitable grounds that in the absence of a binding legal contract sufficiently strong equities are shown which should move the chancery court to grant relief by subrogating him "in the place and stead of the signers of the note of the Benton Harbor State Bank"; and particularly emphasize Sherman's subsequent oral ratification, as testified to by plaintiff and others, which Sherman denies as claimed by plaintiff and rather equivocally seeks to qualify; but whatever assurances or promises he may have made to plaintiff related to the debt of another, were oral and without consideration.

Broadly speaking, equity follows the law and the equitable doctrine of subrogation must be applied with due regard to both the legal and equitable rights of others. A bare moral duty or fraternal obligation of the party sought to be charged is not in itself sufficient ground for substitution. The basic infirmity of plaintiff's claim to right of subrogation is that when he paid the notes of the lodge to protect Marsh he was a mere volunteer paying the debt of a third party, for which neither he nor his property nor defendant was answerable, without the knowledge or consent of the party now sought to be charged and in relation to which he himself had no personal interests to protect.

Bouvier's Law Dictionary (8th Ed. 1914), in defining "subrogation" states that "a principle which lies at the bottom of the doctrine is that the person

seeking it must have paid the debt under grave necessity to save himself a loss. The right is never accorded to a volunteer."

This underlying principle is recognized in and applicable to the facts in *Stroh* v. *O'Hearn,* 176 Mich. 164, cited by plaintiff, and in other Michigan decisions there referred to. In *Palmer* v. *Sharp,* 112 Mich. 420, it is said, "This is undoubtedly the general rule." In which connection it was noted that the question of who is or is not a mere volunteer is not entirely free from difficulties as illustrated by that class of cases where parties have accepted securities in good faith for loans made to discharge existing incumbrances on real estate, and the securities proving invalid subrogation to the rights of prior lienors has been allowed where no superior equities intervened. No such questions arise here. Plaintiff himself testified he paid the lodge debt voluntarily, and it is undisputed that he neither had nor believed he had any property or personal interests to protect in so doing. He voluntarily paid it to protect Marsh, not himself nor defendant. Under such circumstances a claim for subrogation is not permissible, for the principle which lies at the bottom of the doctrine is wanting.

The decree must be reversed and plaintiff's bill dismissed with costs to defendant.

MOORE, C. J., and BROOKE, FELLOWS, STONE, BIRD, and SHARPE, JJ., concurred.

Justice KUHN took no part in this decision.